Slip Op. 03-114

UNITED STATES COURT OF INTERNATIONAL TRADE

_____

VIRAJ FORGINGS, LTD. &
ISIBARS, LTD.

              Plaintiffs,

      v.

UNITED STATES,

              Defendant.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

**PUBLIC VERSION**

Before: WALLACH, Judge
Court No. 01-00889

_____

[Plaintiff's Rule 56.2 motion for judgment upon the agency record is granted in part and denied in part; United States Department of Commerce's final results are remanded]


                                    Dated: September 3**,** 2003

Miller & Chevalier Chartered, (Peter Koenig) for Plaintiffs.

Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director; Patricia M. McCarthy, Assistant Director; Stephen C. Tosini, Trial Attorney, U.S. Department of Justice, Civil Division, Commercial Litigation Branch; and James K. Lockett, Senior Attorney-Advisor, Office of Chief Counsel for Import Administration U.S. Department of Commerce, of Counsel, for Defendants.

**OPINION**

Wallach, Judge

## I.
## Introduction

      This matter comes before the Court on Plaintiff, Viraj Forgings, Ltd.'s, ("Viraj") Motion

for Judgment on the Agency Record, pursuant to USCIT Rule 56.2. At issue are certain aspects

of the United States Department of Commerce's ("Commerce") decision in <u>Certain Stainless Steel Flanges from India; Final Results of Antidumping Duty Administrative Review</u>, 66 Fed. Reg. 48,244 (Sept. 19, 2001) ("Final Results") and the accompanying Memorandum from Joseph A. Spetrini, Deputy Assistant Secretary AD/CVD Enforcement Group III, to Fayar Shirzad, Assistant Secretary for Import Administration, <u>Issues and Decision Memorandum for the Final Results in the Antidumping Duty Administrative of Certain Stainless Steel Flanges from India</u> (Sept. 19, 2001) ("Decision Memoranda"). Pub. Doc. 158; Defendant's Public Appendix for Defendant's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment Upon the Agency Record, 2 ("Pub. App.").  For the reasons set forth below, the Court remands the challenged determination.

## II.
## Background

Plaintiff Viraj is an Indian manufacturer of stainless steel flanges.[1]  In 1994, Commerce published an antidumping duty order for stainless steel flanges from India in <u>Amended Final Determination and Antidumping Order; Certain Forged Stainless Steel Flanges from India</u>, 59 Fed. Reg. 5,994 (Feb. 9, 1994).

In 2000, Commerce published the opportunity to request a review of the antidumping order.  <u>Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity To Request Administrative Review</u>, 65 Fed. Reg. 7,348 (Feb. 14, 2000).  In conformity with 19 C.F.R. § 351.213(b)(1) (1999), petitioners Gerlin Inc., Ideal Forging Corporation, and Maas Flange Corporation requested reviews of manufacturers Isibars,

---

[1] During oral argument counsel for Plaintiff stated that Isibars, Ltd., an original plaintiff in this action, had abandoned its claim challenging Commerce's determination.

Panchmahal, Patheja, and Viraj.  Commerce subsequently published a notice of initiation of antidumping duty administrative reviews covering the period of investigation from February 1, 1999 through January 31, 2000.  Initiation of Antidumping and Countervailing Duty Administrative Reviews, 65 Fed. Reg. 16,875 (Mar. 30, 2000).  The scope of the administrative review covered "certain forged stainless steel flanges from India both finished and not-finished," and included five general types of flanges that also generally matched the American Society for Testing and Materials ("ASTM") specification A-182. Final Results, 66 Fed. Reg. at 48,244.

In April of 2000, as part of the antidumping review, Commerce sent an antidumping questionnaire to respondents. Certain Forged Stainless Steel Flanges From India; Preliminary Results of Antidumping Duty Administrative Review, 66 Fed. Reg. 14,127, 14,128 (Mar. 9, 2001) ("Preliminary Results").  Plaintiff stated in its questionnaire responses that the cost of the raw materials, mainly stainless steel, accounted for the preponderance of the cost of production during the period of review.  Plaintiff also stated that the costs of the other factors of production such as labor, fixed overhead, and variable overhead were roughly proportional to the cost of materials.  The petitioners filed sales-below-cost allegations based on Plaintiff's questionnaire responses and Commerce initiated an investigation to determine whether Plaintiff's sales of flanges during the period of investigation were made below the cost of production.  Id. at 14,129.

Commerce verified the information provided by Plaintiff and preliminarily determined that Plaintiff's dumping margin was 21.10 percent. Id. at 14,130.  On September 19, 2001, Commerce published the Final Results containing the weighted-average dumping margin for the firms under review, which adopted the 21.10 percent dumping margin from the preliminary determination for Viraj.  Final Results, 66 Fed. Reg. at 48,245.  On October 18, 2001, Plaintiff

3

filed a summons with the Court initiating this suit and challenging Commerce's final results. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c) (2000).

## III.
## Standard of Review

This Court will not sustain determinations, findings or conclusions of Commerce that are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." Fujitsu General Ltd. v. United States, 88 F.3d 1034, 1038 (Fed. Cir. 1996); 19 U.S.C. § 1516a(b)(1)(B) (1999). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. NLRB, 340 U.S. 474, 477, 71 S. Ct. 456, 95 L. Ed. 456 (1951) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 299, 59 S. Ct. 206, 83 L. Ed. 126 (1938)). Therefore, in order for Commerce's determination to be sustained, the determination must be reasonable, supported by the record as a whole, and the grounds that the administrative agency acted upon clearly disclosed. See Atlantic Sugar, Ltd. v. United States, 744 F.2d 1556, 1563 (Fed. Cir. 1984); Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 933 (Fed. Cir. 1984); see also SEC v. Chenery Corp., 318 U.S. 80, 94, 63 S. Ct. 454, 462 (1943).

## IV.
## Arguments

Plaintiff challenges the Final Results on three grounds. First, Plaintiff claims that Commerce impermissibly ignored its past precedent and regulations when it selected Germany as the third-country comparison market pursuant to 19 U.S.C. § 1677b(a)(1)(B)(ii) (1999) and 19 C.F.R. § 351.404(e) (1999). Second, Plaintiff argues that Commerce impermissibly compared non-comparable merchandise and ignored its past precedent and regulations when it treated

United States ASTM standard forgings and German Deutsches Institut für Normung e.V. ("DIN") standard flanges as foreign like products under 19 U.S.C. § 1677(16) (1999). Third, Plaintiff contends that Commerce's decision to calculate the dumping margin on a per-kilogram basis rather than a per piece basis resulted in an inaccurate dumping margin, was an unexplained departure from its past precedents, and was contrary to law.

## V.
## Discussion

### A.
### Background

Antidumping laws require that Commerce impose antidumping duties on imported merchandise sold, or likely to be sold, in the United States at less than its fair value when those sales injure or threaten injury to a United States industry. 19 U.S.C. § 1673 (1999). The amount of duty that Commerce imposes is the amount by which the price charged for the subject merchandise in the home market or the "normal value" exceeds the price charged in the United States. 19 U.S.C. § 1677b(a)(1)(A), (B). In most instances, Commerce bases normal value calculations on sales of the foreign like product in the home market. However, Plaintiff stated in its questionnaire response that it sold no flanges in its home market, India. Based on this fact, Commerce concluded that Plaintiff's sales to a third country should be used as the basis for normal value calculations. Preliminary Results, 66 Fed. Reg. at 14,128-14,129; see 19 U.S.C. § 1677b(a)(1)(C); see also 19 C.F.R. § 351.404(b).

The initial threshold for determining whether a third country constitutes a viable comparison market is whether "[t]he Secretary is satisfied that sales of the foreign like product in that country are of sufficient quantity to form the basis of normal value." 19 C.F.R.

§351.404(b)(1). Sufficient quantity for a third country comparison market "is 5 percent or more of the aggregate quantity (or value) of its sales of the subject merchandise to the United States." 19 C.F.R. § 351.404(b)(2) (2000). In this review, Commerce had to calculate normal value as the price at which the flanges were first sold for consumption, in one of the three countries plaintiff listed in its questionnaire (Australia, Canada, or Germany) in usual commercial quantities and in the ordinary course of trade.

In calculating normal value based on prices in a third country, "where prices in more than one third country satisfy the criteria of section 773(a)(1)(B)(ii) of the Act . . . [Commerce] generally will select the third country based on the following criteria:

> (1) The foreign like product exported to a particular third country is more similar to the subject merchandise exported to the United States than is the foreign like product exported to other third countries;
>
> (2) The volume of sales to a particular third country is larger than the volume of sales to other third countries;
>
> (3) Such other factors as the Secretary considers appropriate."

19 C.F.R. § 351.404(e). Plaintiff indicated in its questionnaire responses that its exports of flanges to Australia comprised the smallest market; its exports to Canada had 12 times the required 5 percent threshold with 60 percent of U.S. Sales; and its exports to the largest market, Germany, had 20 times the required 5 percent threshold with 104 percent of U.S. sales. Plaintiff Viraj's Reply to the Defendant's Reply to Viraj's Rule 56.2 Motion for Judgment on the Agency Record ("Plaintiff's Reply") at 19; see also Defendant's Memorandum in Opposition to Plaintiff Viraj's Motion for Judgment upon the Agency Record ("Defendant's Opposition") at 4. In order to calculate normal value for this review, Commerce chose Germany, the largest market Plaintiff reported, as the third country comparison market and verified that the German sales were above

6

the cost of production. Preliminary Results, 66 Fed. Reg. at 14,128-29 (stating that "[w]e found no reason to determine that quantity was not the appropriate basis for these comparisons.").

In addition to determining the appropriate third country comparison market, Commerce must also choose "foreign like products"[2] to compare to the merchandise exported to the United States. Pesquera Mares Australes LTDA. v. United States, 266 F. 3d 1372, 1375 (Fed. Cir. 2001). The statute governing foreign like product provides that

"foreign like product" means merchandise in the first of the following categories in respect of which a determination for the purposes of part II of this subtitle can be satisfactorily made:

(A) The subject merchandise and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise.

(B) Merchandise--
(i) produced in the same country and by the same person as the subject merchandise,

(ii) like that merchandise in component material or materials and in the purposes for which used, and

(iii) approximately equal in commercial value to that merchandise.

(C) Merchandise--
(i) produced in the same country and by the same person and of the same general class or kind as the subject merchandise,

(ii) like that merchandise in the purposes for which used, and

(iii) which the administering authority determines may

---

[2] The words "such or similar merchandise" were used in 19 U.S.C. § 1677(16) prior to 1995, and were replaced (following the enactment of the Uruguay Round Agreement Act ("URAA"), Pub. L. No. 103-465, 108 Stat. 4809 (1994)) by the term "foreign like product."

reasonably be compared with that merchandise.

19 U.S.C. § 1677(16) (1999).  Accuracy, as well as the statute, requires Commerce to first look for identical merchandise with which to match the United States model to the comparable home market or third country model.[3]  See Torrington Co. v. United States, 146 F. Supp. 2d 845, 874 (CIT 2001); 19 U.S.C. § 1677(16).  If identical merchandise is unavailable, Commerce must look to merchandise under the second category, and, if that is not available, under the third category. 19 U.S.C. § 1677(16). Whenever possible, Commerce must make an "apples-to-apples" comparison of merchandise to effectuate a fair comparison between the normal value and United States price. See Torrington Co. v. United States, 68 F.3d 1347, 1352-53 (Fed. Cir. 1995).  Thus, in "accordance with the statutory mandate, [of 19 U.S.C. § 1677(16)] absent identical merchandise, Commerce must 'choose the most similar merchandise for comparison.'" Hussey Copper, Ltd. v. United States, 17 CIT 993, 995, 834 F. Supp. 413, 417 (1993) (quoting Timkin Co. v. United States, 10 CIT 86, 96, 630 F. Supp. 1327,1336 (1986)).

Commerce determined the cost of production by calculating "the sum of the costs of materials and fabrication employed in producing the foreign like product, plus selling, general, and administrative expenses (SG&A) and packing." Defendant's Opposition at 5; Preliminary Results, 66 Fed. Reg. at 14,129. Commerce next calculated German market sales prices and excluded sales that were less than the cost of production. Defendant's Opposition at 5.  Where Plaintiff sold less than 20 percent of the German merchandise below the cost of production, Commerce averaged the cost of all merchandise sales. Id.; see 19 U.S.C. § 1677b(b)(2)(C).

---

[3] The term "identical merchandise" does not require Commerce to make comparisons of merchandise that are "exactly the same," rather Commerce is permitted to compare merchandise that is "the same with minor differences."  Pesquera, 266 F. 3d at 1383 (Fed. Cir. 2001).

8

Where Plaintiff sold more than 20 percent at below the cost of production Commerce excluded all below cost sales from the sample it averaged. Defendant's Opposition at 5; see § 1677b (b)(2)(C), (D).

Commerce then developed a methodology to compare the German DIN proof or fully machined flanges to the ASTM rough forgings, because the merchandise sold to Germany and the United States were made to these two different industrial standards.[4] In the Decision Memoranda, Commerce agreed with the petitioners that flanges, "'whether produced to DIN standards or ASTM standards, will still look the same, serve the same function and be of comparable size and weight . . .[and] [w]hile conceding that flanges produced to DIN standards could be slightly different from the merchandise sold in the United States, the actual differences . . . . are very likely minor or nonexistent.'" Decision Memoranda at 29; Pub. App. 2 at 38. In order to make the merchandise comparable, Commerce converted all flanges and forgings from cost-per-piece, which is how Plaintiff sold the merchandise, to cost-per-kilogram. Preliminary Results, 66 Fed. Reg. at 14,128 (stating that "[t]he record demonstrates that there can be large differences between the weight (and corresponding cost and price) of stainless steel flanges based on relative sizes, so comparisons of aggregate data would be distorted for these products if volume comparisons were based on the number of pieces."). In its cost of production analysis, Commerce "determined that only grade, type, size, pressure rating, and finish were required to

_____

[4] Standardization, in manufacturing, means establishing "desirable criteria for the shape, size, quality and other aspects of a product." See Dictionary of Materials and Manufacturing 375 (Vernon John ed., 1990). The Deutsches Institut fur Normung ("DIN") is a non-governmental organization established to promote the development of standardization in Germany. See id. The American Society for Testing and Materials ("ASTM") is the main body in the United States responsible for issuing standards covering materials, procedures and tests. See id. at 15.

define models for purposes of matching." (collectively "matching criteria"). Id. at 14,129.

The antidumping statute provides for adjustments to normal value if differences in physical characteristics between the foreign like product and the merchandise exported to the United States exist. See 19 U.S.C. § 1677b(a)(6)(C). Therefore, Commerce adjusts normal value for the "difference in cost attributable to the difference in physical characteristics" if the foreign like product is not identical to the merchandise exported to the United States. Mitsubishi Heavy Indus. v. United States, 23 CIT 326, 340, 54 F. Supp.2d 1183, 1196 (1999). Commerce applied the standard 20 percent difference in merchandise ("DIFMER") deviation gap to exclude Plaintiff's products that had a greater than 20 percent difference in cost of production per kilogram from the dumping margin calculations.[5] Id.; Decision Memoranda at 24-26; see also

_____

[5] Although dated July 29, 1992, the Import Administration Policy Bulletin 92.2, Differences in Merchandise; 20% Rule, continues to be applied. See U.S. Import Administration, Policy Bulletin 92.2, Differences in Merchandise; 20% Rule (1992) ("Policy Bulletin"); see also Mitsubishi Heavy Indus. v. United States, 23 CIT 326, 340, 54 F. Supp.2d 1183, 1196 (1999). The bulletin explains that:

> To limit the potential differences in commercial value caused by physical differences, we employ the 20% guideline. If the commercial value of two products is greatly different, then a comparison is not reasonable. . . .When the variable cost difference exceeds 20%, we consider that the probable differences in values of the items to be compared is so large that they cannot reasonably be compared. Since the merchandise is not identical, does not have approximately equal commercial value, and has such large differences in commercial value that it cannot reasonably be compared, the merchandise cannot be considered similar. . . . Sales of products in domestic or third country markets with variable manufacturing cost differences exceeding 20% of the total average cost of manufacture, on a model specific basis, of the product exported to the United States will normally not be utilized in determining foreign market value. Any use of products with the cost of merchandise differences exceeding 20% shall be noted and fully explained.

Id. Commerce may conduct a DIFMER analysis when foreign merchandise is not identical to the exported merchandise, Mitsubishi Heavy Indus., Ltd. v. United States, 97 F. Supp. 2d 1203, 1206

Plaintiff's Reply, Attachment 9 at 48.

**B.**
**Commerce's Selection of Germany as the Third Country Comparison Market was Inconsistent with its Prior Determination and Unsupported by Substantial Evidence**

During an administrative review, Commerce recalculates a company's dumping margin in order to determine whether that company has continued to sell its merchandise in the United States for less than a comparable foreign like product sold in either the company's home market or the applicable third country comparison market. See NTN Bearing Corp. v. United States, 295 F.3d 1263, 1267 (Fed. Cir. 2002); 19 U.S.C. § 1675(a)(2)(A) (1999). Plaintiff argues that Commerce's selection of Germany as the third country comparison market in this review was inconsistent with its own regulations and prior determination. Commerce claims that it chose Germany as the third country comparison market for the purpose of calculating normal value because Germany was the largest market of the three countries Plaintiff listed. Defendant's Opposition at 14, Decision Memoranda at 29-30; Pub. App. 2 at 38-39.

Commerce considers the legal interpretations of prior antidumping and countervailing duty determinations precedential. Citrosuco Paulista, S.A. v. United States, 12 CIT 1196, 1209, 704 F. Supp. 1075, 1088 (1988); MM&P Maritime Advancement, Training, Education & Safety Program, 729 F.2d 748, 755 (Fed. Cir. 1984). Commerce need not "forever hew" to its precedents, but should the agency reverse itself, as a result of the sagacity acquired from experience and changed circumstances, it must confront the issue squarely and explain why its

---

n.4 (CIT 2000), and the analysis "adjusts normal value for the difference in cost attributable to the difference in physical characteristics." Id.; See also Mitsubishi Heavy Indus., Ltd. v. United States, 275 F.3d 1056, 1059 (Fed. Cir. 2001) (explaining that, unless otherwise justified, Commerce will make a finding that the merchandise cannot be reasonably compared should the DIFMER exceed 20 percent).

departure was reasonable. Davila-Bardales v. INS, 27 F.3d 1, 5 (1st Cir. 1994); see also Baoding Yude Chem. Indus. v. United States, 170 F. Supp. 2d 1335, 1340 (CIT 2001). The flexibility to change its position, requires that the agency must explain the basis for its change, and that explanation must be in accordance with law, and supported by substantial evidence. Cultivos Miramonte S.A. v. United States, 21 CIT 1059, 1064, 980 F. Supp. 1268, 1274 (1997). During oral argument, Defendant stated that Commerce "weighed the relative importance of markets, to having an exact model match, and in this case determined that the market was more important."[6]

In a prior review of stainless steel flanges from India, Commerce chose Canada as the appropriate third country comparison market rather than the largest available market, Japan. See Certain Forged Stainless Steel From India; Final Results of Antidumping Duty Administrative Review, 61 Fed. Reg. 51,263 (Oct. 1, 1996) ("Akai Decision"). The exporter in that review, Akai Impex, Ltd. ("Akai") argued against the use of Canada as its third country comparison market. Plaintiff's Reply, Attachment 10 at 67. Akai claimed that Japan was the more appropriate comparison market because Japan was the largest of the third country markets available for comparison. Id. Additionally, Akai wanted Commerce to determine normal value by comparing Akai's sales made to the United States ASTM standard to sales made to the Japanese Industrial Standards ("JIS"). Id. Akai's reasoning was that "the merchandise end use, raw material and process of manufacturing is [sic] same" and the end product in terms of "Dollar per K.G." could be a reasonable comparison methodology. Id. However, Commerce chose the

_____

[6] Counsel for the defendant also stated during oral argument that Germany was chosen as the third market country because it has a large open market. This of course was notwithstanding the fact that Canada has a large open market and that Viraj exported identical, rather than similar, merchandise to Canada. See Defendant's Opposition at 11.

smaller market, Canada, which had goods made to the similar ASTM standard, and compared the merchandise on a price-per-piece basis rather than engaging in the methodology Akai proposed.

Commerce has changed its position in this review and used the method previously proposed by Akai, yet eschewed by Commerce. Defendant admits to a change in position in its brief but claims that "Commerce explained in the Decision Memorandum that, in this case, the German market was decidedly the largest market, whereas, in the earlier decision, the two markets were of roughly equal size." Defendant's Opposition at 14. Thus, Defendant alleges that Commerce adequately explained its factual distinction and departure from Akai. Id.; Decision Memoranda at 30; Pub. App. 2 at 39. Specifically, Commerce stated in the Decision Memorandum that it chose Germany because (1) "in volume, Viraj's German market surpasses its Canadian market significantly;" (2) the Akai Impex precedent "involved a different set of markets, of relative different size;" and (3) Germany was the "largest available comparison market." Decision Memoranda at 30; Pub. App. 2 at 39.

Commerce's reasoning assumes and reiterates its conclusion that Germany is the appropriate comparison market without adequate explanation or support. Neither the preliminary nor final results in the Akai Decision mention that the size of the Canadian and Japanese markets was a factor in the previous determination. See Certain Forged Stainless Steel Flanges from India; Preliminary Results of Antidumping Duty Administrative Review, 61 Fed. Reg. 14,073 (Mar. 29, 1996); Akai Decision, 61 Fed. Reg. 51,263. Moreover, Defendant does not provide the court with evidence that the size of the market in the Akai Decision was a determining factor. If the factual distinction that Commerce is attempting to make is that the size of the market had bearing on Commerce's determination, then that distinction must be supported by evidence.

13

Without such evidence, Commerce's claim is merely unsupported conjecture. "It is well established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." Motor Vehicle Mfrs. Ass'n. v. State Farm, 463 U.S. 29, 50, 103 S. Ct. 2856, 2870, 77 L. Ed. 2d 443, 462 (1983). The Court cannot speculate on Commerce's claims of a (1) "different relative size;" (2) whether the markets were of "roughly equal size;" or (3) whether market size was even a factor in the Akai Decision.

The only evidence provided to the court regarding Commerce's prior practice for determining the appropriate comparison market is the published results from the Akai Decision and the public records from Akai that Plaintiff provided. Plaintiff's Reply, Attachment 10 at 67. That evidence indicates that previously, Commerce's practice has been to chose a smaller market where merchandise was made to the same industrial standard. Lacking further evidence, the Court must view Defendant's claim as unsupported by the prior review.

On remand, Commerce must either rationally articulate the basis for its departure from its previous practice or provide adequate evidence to support its claim of a factual distinction.

**i.**
**Commerce's Claim of a Longstanding Policy of Choosing the Largest Available Third Country Market as the Comparison Market is Unsupported by Substantial Evidence**

Defendant also claims that in this determination "Commerce . . . followed its longstanding policy of giving more weight to market size, where product differences are easily adjusted, to conclude that German and U.S. market flanges were substantially similar and that the substantially larger size of the market in Germany made it the best available comparison

14

market."[7] Defendant's Opposition at 13-14; See also Decision Memoranda at 29-30; Pub. App. 2 at 38-39. During oral argument, Defendant was unable to provide any evidence to support its claim of a longstanding policy or practice. Plaintiff contends that Commerce's claim of a longstanding practice is unsupported and its decision was an impermissible, unexplained departure from its prior precedent.

Commerce may base its normal value calculations on third-country prices pursuant to 19 U.S.C. § 1677b(a)(1)(B)(ii). The appropriate third country comparison market is generally chosen based on: (1) a more similar foreign like product to the subject merchandise exported to the United States than other third countries; (2) the volume of sales is larger than the volume of sales to other third countries; and (3) other factors as the Secretary considers appropriate. 19 C.F.R. § 351.404(e). Defendant argues that Commerce followed the same practices that it did in prior reviews and that "weighing all of the 19 C.F.R. § 351.404(e) factors, Commerce determined that Germany was the most comparable third-country market." Defendant's Opposition at 15.

The comments to the 1997 regulations in Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,358 (May 19, 1997), explain that "§ 351.404(e) is sufficiently clear that (1) not all of the three criteria need be present in order to justify the selection of a particular market, and (2) *no single criterion is dispositive*." Antidumping Duties; Countervailing Duties, 62 Fed. Reg. at 27,358 (emphasis added). Therefore, pursuant to 19 C.F.R. § 351.404(e), Commerce is not required to choose the appropriate comparison market *solely* because the goods are identical, any more than it is required to choose the appropriate comparison market *solely* because the

---

[7] The Decision Memorandum states that "[w]e agree with petitioners that Viraj fails to provide justification for deviating from our general practice, which is to use the largest comparison market." Decision Memorandum at 30; Pub. App. 2 at 39.

15

market is the largest available.

Defendant's claim, without evidence, that it is following a longstanding policy, is problematic for the Court because Plaintiff has provided evidence that Commerce used sales of merchandise to a third country market that was not the largest available in a prior review. See Akai Decision, 61 Fed. Reg. 51,263. Hence, Commerce's conclusory statement that it is following a longstanding policy without providing adequate evidence that such a practice exists, as well as its failure to conform itself to its prior review, renders its decision unsupported by substantial evidence and not in accordance with its regulations.

On remand, Commerce must conform itself to its prior precedent, adequately explain the basis for its departure from its prior precedent, or provide substantial evidence of its longstanding practice.

**ii.**
**Plaintiff's Claim that Commerce was Required to Choose Canada as the Appropriate Third Country Comparison Market is Unavailing**

Plaintiff argues that Commerce should have determined that Canada was the appropriate third country comparison market, because the merchandise it sold in Canada was made to the same ASTM standards as the merchandise sold in the United States. Plaintiff's sales to Canada meet the statutory requirements for third country comparison markets. First, Plaintiff's exports to Canada had 12 times the required 5 percent threshold, with 60 percent of U.S. Sales. Second, the exports to Canada were made to the same standard as the exports to the United States, thus, meeting the criteria of § 351.404(e)(1). Finally, while both Australia and Canada flanges are made to ASTM standards, Plaintiff's exports to Canada exceed those to Australia; thus, Canada meets the requirements of § 351.404(e)(2).

Had Commerce initially determined that Canada was the appropriate market, it could have easily conformed its determination to prior reviews and compared identical merchandise. However, Commerce chose to use Germany, and § 351.404(e) states that the factors should *generally* be used to determine which market is the appropriate third country market.

Defendant accurately points out the court must defer to Commerce's choice of market when Commerce has assessed and weighed "market size and strength, product and market similarity, and other factors it deems relevant." Defendant's Opposition at 13. Defendant's reason for choosing Germany was that "Commerce weighed both of the enumerated factors and followed its longstanding policy of giving more weight to market size." Id. Because of the prior precedent, and Defendant's failure to provide evidence of the longstanding policy, the court is unable to uphold Commerce's determination that Germany was the appropriate market.

However, Plaintiff's conclusion that Commerce's failure to provide adequate evidence requires that Commerce chose Canada as the third country comparison market is inaccurate. The evidence before the Court is that three markets meet the third country market viability requirements and that Germany was the largest, followed by Canada, and finally, Australia. Commerce has not provided evidence, pursuant to §351.404(e)(1), that certain "foreign like products" are more similar than others, as explained below. Nor has Commerce provided the Court with evidence of any other criteria it may have used in determining the appropriate market. Thus, Plaintiff's assumption that Canada was the only appropriate third country comparison market, although compelling, is premature. Therefore, the Court rejects Plaintiff's claim that the only appropriate comparison market is Canada.

17

## C.
### Commerce's Claim that ASTM Forgings and DIN Proof Machined and Fully Machined Flanges are Comparable is Unsupported by Substantial Evidence

Plaintiff argues that the rough forgings sold in the United States should not be compared to proof-machined or fully machined flanges sold in Germany. Commerce claimed that ASTM forgings and DIN flanges could be compared by adjusting for the matching criteria. See Preliminary Results, 66 Fed. Reg. at 14,129. Defendant stated that "because United States and German market flanges are manufactured to different standards, Commerce applied 19 U.S.C. § 1677(16) (B) to match the appropriate foreign like products to corresponding U.S. market flanges." Defendant's Opposition at 17; Decision Memoranda at 26-28; Pub. App. 2 at 35-37.

Commerce's methodology for making the German DIN standard proof or fully machined flanges comparable to the ASTM standard United States rough forgings consisted of converting all flanges and forgings from a cost-per-piece basis, which is how Plaintiff sold the merchandise, to a cost-per-kilogram basis. Preliminary Results, 66 Fed. Reg. at 14,129. In its cost of production analysis, Commerce determined that it would define comparable models based on matching criteria, of (1) grade, (2) type, (3) size, (4) pressure rating, and (5) finish. Id. Finally, Commerce applied the standard 20 percent difference in merchandise ("DIFMER") deviation gap to exclude products that had a greater than 20 percent difference in cost of production per kilogram from the dumping margin calculations. Id.; Decision Memoranda at 24-26; Pub. App. 2 at 33-35.

Commerce agreed with petitioners that flanges, "whether produced to DIN standards or ASTM standards, will still look the same, serve the same function and be of comparable size and weight [, and] [w]hile conceding that flanges produced to DIN standards could be slightly

different from the merchandise sold in the United States, the actual differences . . . . are very *likely* minor or nonexistent."[8] Decision Memoranda at 29; Pub. App. 2 at 38; Defendant's Opposition at 7 (emphasis added).  During oral argument Defendant admitted that the petitioners had not provided evidence for their assertion that any differences between German flanges and United States flanges were in fact "*likely*" insignificant or minor.  See Decision Memoranda at 29; Pub. App. 2 at 38 (emphasis added).

Commerce must determine the appropriate "foreign like product," in accordance with 19 U.S.C. § 1677(16)(B), and must "make a fair comparison between the United States price charged for the subject merchandise . . . and the price charged for the corresponding "foreign like product." Pesquera, 266 F.3d at 1375.  While it is certainly simpler for Commerce to identify and compare identical merchandise when it exists; lacking identical goods for comparison Commerce must find similar merchandise in order to make a proper comparison with the United States imports. See NTN Bearing Corp. of Am. v. United States, 127 F.3d 1061, 1063 (Fed. Cir. 1997). The Tariff Act of 1930, broadly defines "such or similar," and the methodology that Commerce may use to match U.S. products with third country products.[9]  See Koyo Seiko Co. v. United States, 66 F.3d 1204, 1209 (Fed. Cir. 1995).  Because the Act does not specify a model match

---

[8] The types of flanges covered in this review were (1) weld neck, used for butt-weld line connection; (2) threaded, used for threaded line connections; (3) slip-on and lap joint, used with stub-ends/butt-weld line connections; (4) socket weld, used to fit pipe into a machined recession; and (5) blind, used to seal off a line. Final Results, 66 Fed. Reg. at 48,244. Flanges are used for connecting pipes. See Letter from Ablondi, Foster, Sobin & David, to U.S. Secretary of Commerce, Stainless Steel Flanges From India at 2; Defendant's Non Public Appendix for Defendant's Memorandum in Opposition to Plaintiff's Motion for Judgment Upon the Agency Record, Non Public Document ("NPD") 2 at 16 ("Non Pub. App.") (discussing the use of flanges for connecting pipes).

[9] Cases involving claims made prior to 1995 use the term "such or similar merchandise," subsequently replaced by the term "foreign like product" see infra p. 7 note 2.

method, the Act implicitly authorizes Commerce to choose a method by which to identify such or similar merchandise. Id. However, when Commerce has chosen a methodology that is patently unreasonable, unsupported by the evidence, or contrary to the antidumping laws, Commerce's determination may not be sustained by this Court. See NTN Bearing Corp. v. United States, 14 CIT 623, 633, 747 F. Supp 726, 736 (CIT 1990); see also Zenith Elecs. Corp. v. United States, 77 F.3d 426, 430 (Fed. Cir. 1996); 19 U.S.C. § 1516a(b)(1)(B).

Commerce apparently used the second criteria of § 351.404(e), the larger market size of Germany, in order to deem the DIN flanges and ASTM forgings substantially similar foreign like products. Commerce's determination begs the question of whether the merchandise is similar by propagating a conditional fallacy that the antecedent, Germany as the appropriate market because it is the largest market available, affirms the consequent, German DIN flanges and ASTM forgings are similar and comparable merchandise. This argument errs because there is no record evidence that Commerce independently determined that the foreign like product that Commerce used, German DIN flanges, were in fact either fundamentally identical or similar to the United States ASTM forgings for the purposes of the 19 U.S.C. § 1677(16) hierarchy; nor has Defendant provided evidence of a longstanding policy.[10]

In response to Commerce's supplemental questions, Plaintiff indicated that rough forgings were sold in United States while only proof or fully-machined flanges were sold to

---

[10] During oral argument when the Court questioned Defendant as to whether it would be more accurate for Commerce to compare finished flanges to finished flanges, and ASTM standard merchandise to other ASTM standard goods. Defendant responded that it would not be more accurate as the larger market size was more correctable. However, Defendant failed to explain how market size made differences between the merchandise more correctable.

Germany.[11]  Plaintiff requested that proof and fully-machined flanges made to DIN standards be compared to proof and fully-machined flanges made to ASTM standards for the United States. Plaintiff asserted that "[a] customer who has ordered an [ASTM] 304L flange will not accept a [DIN] 1.4541 flange as a substitute," and that DIN flanges weighed significantly less than the rough forgings sold to the U.S. and yet were higher in both cost and value.  Plaintiff's Reply, Attachment 8 at 41.  Plaintiff claimed that the ASTM forgings that Commerce compared to DIN flanges were not functional without significant further processing and that "comparing a rough forging to a flange is like comparing a cloth and a garment made from cloth - the two cannot be compared."  Plaintiff's Reply, Attachment 10 at 64. Additionally, Plaintiff stated that DIN standard flanges and ASTM standard forgings are sold to different end users.[12]

The lack of interchangeability between products will not defeat a finding of "similar merchandise." See Sony Corp. of America v. United States, 13 C.I.T. 353, 359, 712 F. Supp. 978, 983 (1989).  Pursuant to 19 U.S.C. § 1677(16)(B)(ii), Commerce must find that the third country comparison product is "like" the subject merchandise in the purpose for which it is used. Koyo Seiko Co., 66 F.3d at 1210.

In this review, Commerce assumed that the merchandise was comparable because of

_____

[11] Commerce verified Viraj's sales and Plaintiff indicated that "80% of flanges sold in the United States are unfinished" whereas 100% of flanges sold in Germany are either proof or fully machined. Memorandum from Thomas H. Killiam, Financial Analyst, to The File, Antidumping Duty Order on Certain Forged Stainless Steel Flanges from India - Analysis Memorandum for Preliminary Results of New Shipper Administrative Review (Sept. 25, 1996) ("Analysis Memo"); Plaintiff's Reply, Attachment 1.

[12] Rough forgings are a raw material supplied to machine shops in the United States who then machine the final product to make a flange.  Once machined, the machine shop sells the product to a distributor.  Plaintiff's Reply, Attachment 10 at 66.  Fully machined flanges are sold to distributors who sell the product to the end user - oil refineries, food processing industries, etc. Id.

market size without adequately elucidating any comparable qualities of ASTM forgings and DIN flanges or supporting its choice with substantial evidence. Conversely, Plaintiff provided record evidence that suggests that the ASTM forgings and DIN flanges that Commerce compared were not similar.[13] Plaintiff argues and the record shows that first, the materials used in producing the flanges and forgings are of different composition. The type of liquid that is going to pass through the flange generally dictates the grade of steel used. See Plaintiff's Reply, Attachment 7 at 36. German DIN flanges use steel with a higher level of nickel and titanium, and it is the addition of

---

[13] In addition to the physical evidence, provided by Viraj, Plaintiff cited two Customs cases to illustrate that flanges and forgings were not comparable. Plaintiff's Reply at 5; see Decision Memoranda at 26; Pub. App. 35; see also Midwood Industries, Inc. v. United States, 64 Cust. Ct. 499, 507-08, 313 F. Supp. 951, 956-57 (Cust. Ct. 1970); see also Boltex Mfg. Co., L.P. v. United States, 140 F. Supp. 2d 1339, 1346-51 (CIT 2000). Commerce claimed that the cases "were not directly applicable to the question of merchandise comparability for antidumping purposes, since they involved Customs classification issues." Decision Memoranda at 26; Non Pub. App. 35. The Court agrees with Commerce that the classification issues are not directly applicable, however, the discussion in these cases of the differences between forgings and finished flanges is illustrative of differences between the two goods. In Midwood, this court stated that,

> the imported articles, referred to . . . as 'forgings' of one kind or another, are *producers'* goods which are not in fact used by the consumer in such state of manufacture and are not capable of use by the consumer in that state. . . .[T]he imported forgings are made as close to the dimensions of ultimate finished form as is possible, they, nevertheless, remain forgings unless and until converted by some manufacturer into *consumers'* goods, i.e., flanges and fittings. And as *producers'* goods the forgings are a material of further manufacture, having, as such, a special value and appeal only for manufacturers of flanges and fittings. But, as *consumers'* goods the flanges and fittings produced from these forgings are end use products, having, as such, a special value and appeal for industrial users and for distributors of industrial products. Consequently, the two classes of goods, namely, the imported forgings, and the fittings and flanges made therefrom, are different articles of commerce in a tariff sense.

Midwood, 64 Cust. Ct. at 507-08. More recently, Boltex explained that Midwood has not been overruled and reiterated the Midwood opinion's discussion of the various processes involved in converting forgings into fittings and flanges. Boltex, 140 F. Supp. 2d at 1346-51.

nickel which improves the quality of the steel. The European flanges Plaintiff sells are used in "highly corrosive areas where better corrosion capacity of steel is always preferred." Plaintiff's Reply at 17; Plaintiff's Reply, Attachment 6 at 32. Accordingly, Plaintiff states that these general chemical differences between German DIN standard merchandise and United States ASTM merchandise exist and are critical to the buyer.[14]

Second, Plaintiff provided evidence that the DIN and ASTM flanges' physical structure differs, and that flanges must meet different standards and specifications. "Standards are determined by the type of liquid which will pass through a system (e.g., acid, water), the pressure, and the flow-rate of the liquid." Plaintiff's Reply, Attachment 7 at 36. A DIN flange that is put to the same application as an ASTM flange has a different outside diameter and a DIN standard flange is thinner than its ASTM counterpart.

Finally, and perhaps most importantly, given Commerce's use of cost-per-kilogram price comparisons, the record evidence regarding the differences between DIN and ASTM flanges, reveals that DIN standard flanges weigh less than the supposedly similar ASTM forgings. The record indicates that extensive machining may be required to convert a rough forging into a finished flange made to the German DIN standard. This machining may result in a 30% average

---

[14] Plaintiff provided information regarding the percentage difference between the chemical composition of the merchandise Commerce compared:

|  | ASTM 304L | DIN 1.4541 | % Difference |
| --- | --- | --- | --- |
| Nickel (Ni) | 8-12 | 9-12 | 5% |
| Carbon (C) | .030 | .080 | 166% |
| Chromium (Cr) | 18-20 | 17-19 | 5% |
| Titanium (Ti) | NIL | .70 | Infinite |

Plaintiff's Reply, Attachment 8 at 41.

weight loss from forging to finished flange. Memorandum from Michael Heaney, Sr. Import Compliance Specialist and Thomas Killiam, Import Compliance Specialist, to The File, <u>Sales Verification of Viraj Forgings-Certain Forged Stainless Steel Flanges from India</u> at 35 (Feb. 7, 2001); Plaintiff's Reply at 4, n. 4; Plaintiff's Reply, Attachment 7 at 35.

The court can only uphold Commerce's determination if it is based on substantial evidence. Substantial evidence "must be enough reasonably to support a conclusion." <u>Ceramica Regiomontana, S.A. v. United States</u>, 10 C.I.T. 399, 405, 636 F. Supp. 961, 966 (1986). It is not necessary for Commerce to compare merchandise that is "technically substitutable, purchased by the same type of customers, or applied to the same end use as the U.S. model," <u>Koyo Seiko Co.</u>, 66 F.3d at 1210, and thus, a comparison of DIN flanges and ASTM forgings might be permissible should Commerce determine and provide substantial evidence that the products are "like" merchandise in accordance with 19 U.S.C. § 1677(16). However, the court "cannot defer to a decision which is based on inadequate analysis or reasoning." <u>USX Corp. v. United States</u>, 11 CIT 82, 88, 655 F. Supp. 487, 492 (1987).

While Plaintiff's evidence and reasoning in and of itself does not indicate that Commerce could not compare ASTM and DIN flanges and forgings, it does indicate that differences exist between forgings and flanges. Without adequate record evidence as to whether the differences are insignificant, the Court cannot uphold Commerce's determination that the differences are "likely" minor or insignificant and thus, the products "like" for the purposes of calculating normal value pursuant to 19 U.S.C. § 1677(16).

**D.**

**Commerce's Comparison of ASTM Forgings and DIN Proof Machined and Fully Machined Flanges is a Departure from its Prior Determination and its Reasoning is Unsupported by Substantial Evidence**

As noted above, Commerce compared Viraj's U.S. sales with contemporaneous sales in Germany and considered stainless steel flanges identical based on the matching criteria. See Preliminary Results, 66 Fed. Reg. at 14,129. In the Akai Decision, Commerce chose Canada, which uses the same standards as the U.S., as the appropriate third country comparison market. Akai Decision, 61 Fed. Reg. at 51,263-65. Plaintiff claims that in order to be consistent with previous determinations, Commerce should have used the Canadian market and compared ASTM flanges to other ASTM standard merchandise.[15] Plaintiff's Motion at 6-7; Plaintiff's Reply at 19.

---

[15] On September 25, 1995, Viraj requested a new shipper review. The method and explanation Commerce provided is similar to the Akai Decision. The analysis memorandum for its preliminary results discusses the model match methodology that Commerce used in determining Viraj's New Shipper dumping margin. Plaintiff's Reply, Attachment 1 at 2; Memorandum from Thomas H. Killiam, Financial Analyst, to The File, Antidumping Duty Order on Certain Forged Stainless Steel Flanges from India - Analysis Memorandum for Preliminary Results of New Shipper Administrative Review (Sept. 25, 1996) ("Memo"). The Memo states that:

> In accordance with section 771(10) of the Act, we searched for the third country model which is most like or most similar in characteristics with each U.S. model. To perform the model match, we first searched for the most similar third country model with regard to alloy. *If there were several third country models with identical alloy, we then searched for the most similar third country model with regard to . . . type and standard.* If, as a result of this analysis, several third country models were deemed equally similar, we chose the third country model which, when compared to the U.S. model, had the lowest difference in variable cost of manufacturing (difmer), provided the difmer did not exceed 20 percent of the total cost of manufacturing of the U.S. model.

Plaintiff's Reply, Attachment 1 at Pages 3-4 (emphasis added).

25

In the Akai Decision, Commerce determined the most similar third-country model, based on the alloy grade, size, type, and the ASTM standard, and compared the merchandise to the U.S. model on a cost-per-piece basis; and then adjusted for product differences using DIFMER.[16]

> [T]he Department selected alloy grade, size, type, and the ASTM standard designation as the hierarchy of physical characteristics to use in determining the identical or most similar third-country model to compare to each U.S. model. . . in determining NV, the Department must base its valuation on the price of "such or similar merchandise" sold in the home market (third country) (see 19 U.S.C. § 1677b(a)(1)(A)). . . . When several third-country models are equally similar in physical characteristics, we choose the third-country model which, when compared to the U.S. model, has the lowest difference in variable costs of manufacturing, provided the difmer does not exceed 20 percent of the total cost of manufacturing of the U.S. model . . . . The Department's adoption of the "20 percent difmer" test, pursuant to 19 CFR § 353.57(b)(1992), ensures the selection of the home market (third-country) model with the greatest commercial similarity to the U.S. model. Therefore, when the four physical criteria of alloy, type, size, and ASTM standard designation were equally similar, we matched the U.S. model to the third-country model having the least difference in variable costs between it and the U.S. model, provided the cost difference was no greater than 20 percent.

---

[16] DIFMER allows differences between products to be increased or decreased by "the amount of any difference (or lack thereof) between the export price . . . and the [amount] wholly or partly due to-- the fact that merchandise described in subparagraph . . . (B) and (C) of section 1677(16) of this title is used in determining normal value. 19 U.S.C. § 1677b(a)(6)(C). Sections (B) and (C) of § 1677(16), provide for the determination of "foreign like product" from,

> (B) Merchandise--
> (i) produced in the same country and by the same person as the subject merchandise,
> (ii) like that merchandise in component material or materials and in the purposes for which used, and
> (iii) approximately equal in commercial value to that merchandise.
>
> (C) Merchandise--
> (i) produced in the same country and by the same person and of the same general class or kind as the subject merchandise,
> (ii) like that merchandise in the purposes for which used, and
> (iii) which the administering authority determines may reasonably be compared with that merchandise.

26

Akai Decision, 61 FR at 51,264-65 (citations omitted); See also Certain Forged Stainless Steel

Flanges From India, 61 Fed. Reg.14,073.

In this review, Commerce converted all of the merchandise to cost-per-kilogram,

determined that differences in the goods were likely minor, and compared Plaintiff's U.S. sales

with contemporaneous sales of the foreign like product in Germany by

> consider[ing] stainless steel flanges identical based on the following five criteria:
> grade, type, size, pressure rating, and finish . . . us[ing] a 20 percent
> difference-in-merchandise (difmer) cost deviation cap as the maximum difference
> in cost allowable for similar merchandise, which we calculated as the absolute
> value of the difference between the U.S. and comparison market variable costs of
> manufacturing divided by the total cost of manufacturing of the U.S. product.

Preliminary Results, 66 Fed. Reg. at 14,129. Commerce has broad discretion to devise model-

match methodologies to determine what constitutes similar merchandise. See, e.g. Torrington

Co. v. United States, 881 F. Supp. 622, 635 (CIT 1995). However, the product's standard was

apparently not used as one of the criteria because Commerce agreed with petitioners that the

actual differences between ASTM and DIN standard merchandise were "very likely minor or

non-existent." Decision Memoranda at 29-30; Pub. App. 2 at 38-39. Commerce's previous

model-match methodology compared ASTM standard merchandise and then used DIFMER to

adjust for differences on a cost-per-piece basis.

Defendant's insistence during oral argument that by selecting the largest comparison

market, merchandise might be rendered comparable, is a significant departure from its prior

method for determining comparable merchandise. While Commerce has the flexibility to change

its methodology, its change must be reasonable. See Cultivos Miramonte S.A., 980 F.Supp. at

1274. Volume of sales to a particular third country market compared to sales with other third

countries is certainly a factor that Commerce may consider, pursuant to 19 C.F.R. § 351.404(e),

27

in determining the appropriate third country comparison market and merchandise. However, Commerce's premise, that forgings and flanges "likely" had minor differences, and, thus, DIN and ASTM merchandise were sufficiently comparable, is neither supported by substantial evidence nor born out by the administrative record, prior administrative reviews, or illustrative case law. Commerce's insufficient assertion, that differences between ASTM forgings and DIN flanges are "likely" minor and that use of the largest comparison renders merchandise comparable, ultimately results in its model match methodology and reasoning unsupported by substantial evidence.

Therefore, because Commerce changed its methodology and matching criteria from previous reviews, and no record evidence exists to support its claims that the goods are similar, the Court finds that Commerce has departed from its prior precedent without adequate explanation or support by substantial evidence.

**E.**
**Commerce's Calculation of the Antidumping Margin Based on Per Kilogram Prices is Not in Accordance with Law**

Plaintiff alleges that in prior antidumping reviews Commerce has held that if merchandise is sold per piece, not by weight, the dumping margin must be calculated per piece in order to avoid distortion in the dumping margin. See Final Determination of Sales at Less than Fair Value: Certain Carbon Steel Butt-Weld Pipe Fittings from Thailand, 57 Fed. Reg. 21,065, 21,069-70 (May 18, 1992) ("Carbon Steel"). Defendant claims that it has long been Commerce's policy to compare prices for similar steel products across markets by weight, and "in all cases where the agency made per piece comparisons, the weights of the compared products were identical." Defendant's Opposition at 21.

The Defendant mentions two instances in which per piece costs were used and questions Plaintiff's reliance on the first, Carbon Steel, in its brief because Carbon Steel was a "decade-old decision."[17] Id. Defendant states that "the use of per-piece comparisons in earlier reviews comparing identical products does not tie the agency to such a methodology where weight governs the cost of production of different products." Decision Memoranda at 24; Pub. App. 2 at 33. Additionally, Commerce stated that "Viraj has not cited, nor can we find, any examples of cases in the past six years to substantiate the assertion that per-piece analysis was continued beyond the early and distinct instances." Analysis Memo, Comment 13. The calculation of the dumping margin in Commerce's previous review of Plaintiff, as well as in Plaintiff's New Shipper review, was accomplished on a per piece basis. See Plaintiff's Reply at 8; Plaintiff's Attachment 1; Non Pub. App., NPD 2 at 3. In prior reviews when the Plaintiff's comparison market and United States sales were similar rather than identical, due to physical differences, including weight, the DIFMER adjustment was made on the dumping margin calculation to account for differences. See Plaintiff's Reply, Attachment 1.

The court is concerned with Commerce's easy dismissal of past precedents. Precedent, unless inapplicable or properly invalidated, binds this court and Commerce. The court agrees with Commerce to the extent that an agency is not forever tied to a methodology. However, if an agency departs from its prior precedent without adequate explanation, its actions are unlawful. MM&P Advancement Training, Education Safety Program v. DOC, 729 F.2d 748, 755 (Fed. Cir. 1984). The Final Results in Carbon Steel state that Commerce "converted all prices and

---

[17] The other determination was a per piece comparison made in the 1995 investigation involving Isibars, Ltd. In that review, Commerce used the home market sales rather than third country sales.

29

adjustments from a weight basis to a unit (per piece) basis *because* merchandise is sold by piece instead of weight."[18] Carbon Steel, 57 Fed. Reg. at 21,065 (emphasis added). Among the explanations in Defendant's brief, what remains clear is that Defendant's arguments sublimate the results of the Carbon Steel determination into a different form. Commerce argues that the Carbon Steel comparisons were de facto per-kilogram comparisons because the products were identical; and therefore, the Carbon Steel determination is distinguishable. Defendant's explanation for its departure, which it claims is not actually a departure at all, is that "in Carbon Steel, whenever Commerce *seemingly* made comparisons of merchandise on a per-piece basis, the comparisons were of identical merchandise." Defendant's Opposition at 21. (Emphasis added). If the comparison by weight or by piece was truly unimportant in cases of identical merchandise, this Court is left to speculate on why Commerce would bother converting from cost-per-weight to cost-per-piece in Carbon Steel because, according to Defendant, it should not matter how the merchandise was compared if it was identical. Yet in Carbon Steel, Commerce

---

[18] In Carbon Steel, Commerce applied the 10/90/10 test and determined that home market sales were inadequate. Under the test, if between 90% and 100% of the home market sales for a model were below the cost of production, and the below-cost sales occurred over an extended period, Commerce considered the remaining above-cost sales to be inadequate and used constructed value to calculate foreign market value.

The respondent requested that Commerce apply the 10/90/10 test for measuring sales below cost of production on a product weight basis and claimed that price and cost were directly related to product weight. The petitioners argued that respondent's request was an attempt to obscure the significance of respondents below-cost sales and that because respondent sold its merchandise on a per piece basis, and respondent had not supported its claim that applying the 10/90/10 rule on a per piece basis would not account for differences among the heavy and light pipe fittings, and requested that Commerce apply the 10/90/10 test on a per piece basis.

Ultimately, Commerce agreed with the petitioner and stated that it was Commerce's standard practice to apply the 10/90/10 test on the basis on which the subject merchandise is sold. Commerce converted the prices and adjustments reported on a per weight basis to a per piece basis because the respondent sold pipe fittings on a per piece basis.

specifically explained that it was going to convert from per weight to per piece "because" that was the way the merchandise was sold.

Because Defendant has not submitted any evidence to the contrary, the court bases its decision on Commerce's prior determinations and the reasoning stated in the Carbon Steel review, that Commerce converted all prices and adjustments from a weight basis to a per piece basis *because* the merchandise was sold by piece instead of weight.

Therefore, Commerce must either conform itself to its prior precedent and compare Plaintiff's merchandise in the manner in which it is sold, or adequately explain its departure and support all of its factual arguments with substantial evidence.

**F.**
**Commerce's Reasoning for Its Price Per Kilogram Methodology for Comparing Rough Forgings to Proof-Machined and Finished Flanges is Unsupported by Substantial Evidence**

Plaintiff claims that Commerce, by converting Viraj's reported per piece prices and costs to per kilogram amounts, increased the dumping margin from 8.95 percent to 21.1 percent. Plaintiff's Motion at 3. Defendant argues that in cases where differences in the cost of production of similar products are almost entirely attributable to weight, Commerce has consistently harmonized the process by using weight as the common denominator rather than per piece price comparisons. Defendant claims that Commerce "took careful note of the commercial realities of the flange market" and that the "raw material costs dominate the cost of production." Defendant's Opposition at 22, 26. Therefore, Defendant stated that logically "if a flange has a higher weight, and the cost of raw materials predominates, one expects a higher cost and a higher price . . . [and a]ccordingly Commerce explained in the Final Results, as well as in earlier decisions, why weight is a better basis in this type of scenario." Id. at 22. Hence, "Commerce

31

agreed with the petitioners and determined that it would follow its standard methodology of comparing prices by weight," Defendant's Opposition at 8.

Plaintiff supplied Commerce and the Court with merchandise comparisons that show that Commerce's comparisons of forgings to flanges by cost-per-kilogram create significantly different results than those claimed by Commerce. See Plaintiff's Reply, Attachment 10 at 70. The record indicates that, on average, a forging has a 30 percent weight loss when machined from its rough state into a finished state. Plaintiff's Reply at 4-5 & n.4. Additionally, a finished flange can have up to a 50 percent higher price per piece than its heavier rough forging counterpart. See Plaintiff's Reply, Attachment 10 at 64. The record also indicates that the cost-per-kilogram, for a proof machined flange, may be up to 167 percent more than the rough forging; and a fully finished flange may be up to 234 percent more than the rough forging. See Plaintiff's Reply, Attachment 4 at 17-19. Thus, given the 30 percent weight loss, the value added from the machining process gives the lighter flange a higher cost of production on a per kilogram basis than the heavier rough forging.

If Defendant's claim were accurate, then logically, a heavier forging should cost more per-kilogram than the lighter flange. The record evidence indicates the opposite. See Non Pub. App., NPD 2 at 3. Commerce has broad discretion to determine similar merchandise, however, its methodology and reasoning must be supported by substantial record evidence. In this case, Plaintiff claims, and the record evidence suggests, that the value added from machining gives the lighter proof or fully machined flange a higher cost of production on a cost-per-kilogram basis, than the heavier rough forging, even though on a cost-per-piece basis the heavier forging costs

32

more.[19]  See Non Pub. App., NPD 2 at 3, 5, 47-50; Plaintiff's Reply, Attachment 4 at 16-19. Therefore, the record evidence indicates that the finish must be more determinative of cost than the weight of the piece.

Additionally, Defendant contends that Commerce has referred to the use of weight as "our standard methodology" since 1993 and cites to Notice of Final Results of Antidumping Duty Administrative Reviews and Determination Not to Revoke in Part: Certain Corrosion-Resistant Carbon Steel Flat Products and Cut-to-Length Carbon Steel Plate from Canada, 66 Fed. Reg. 3543 (Jan. 26, 2001) ("Corrosion-Resistant Carbon Steel") and accompanying Memorandum from Joseph A. Spetrini, Deputy Assistant Secretary, to Troy H. Cribb, Assistant Secretary for Import Administration, Issues and Decision Memo for the Final Results of the Antidumping Duty Administrative Reviews and the Determination not to Revoke in Part of Certain Corrosion Resistant Carbon Steel Flat Products and Cut-to-Length Carbon Steel Plate from Canada - 8/01/98 through 7/31/99 (Jan. 16, 2001 ("Carbon Steel Memo"). In Corrosion-Resistant Carbon Steel, the product under review was sold on a weight basis. Commerce stated that the use of weight "provided the Department with results which are both consistent and predictable in formulating the margin analysis." Carbon Steel Memo at Comment 1. However,

---

[19] Plaintiff explained in its supplemental answers that where grade, size, and type are the same, the following effect occurs for the same flange with different finishes:

| Finish of Flange | Weight Per Piece | $ Price per Piece | $ Price Per Kilogram |
|---|---|---|---|
| 1. Rough | 7.100 kg. | $16.29 | $ 2.294 |
| 2. Proof-Machined | 6.500 kg. | $15.27 | $ 2.349 |
| 3. Fully-Finished | 5.200 kg. | $15.72 | $ 3.023 |

Therefore, Plaintiff claims that the price of the product is not more correlative with weight, as Commerce claimed, but rather with finish. See Non Pub. App., NPD 2 at 3, 5, 47-50; Plaintiff's Attachment 4 at 16-19.

Commerce also stated that it used weight comparisons because

> a large number of steel products are most commonly priced using weight as the standard measurement. Because weight is so commonly used in this manner, many companies track costs based on a weight unit measure for determining selling expenses, inputs and other information. Thus, the Department is able to make comparisons between steel products on a consistent unit basis by using a weight based standard.

Id.

Plaintiff argues that, unlike the products in Corrosion-Resistant Carbon Steel, stainless steel flanges and forgings are not sold on a weight basis nor does Plaintiff track its costs on a weight basis. During the review, Plaintiff argued to Commerce that in all past flange cases, Commerce calculated the dumping margin on a per piece basis, and that no adequate explanation had been given for why, for the first time, the dumping margin calculation was done on a per kilogram basis. Plaintiff's Attachment 10 at 58. Additionally, Plaintiff contended that the dumping analysis should be done on the "basis of prices as they actually exist in the market, not on artificially created prices that have no market or real world basis." See id. Plaintiff claims that no meritorious justification has been offered by Commerce as a rationale for departing from real world prices and using artificially created per kilogram prices and that by comparing the merchandise on a cost-per-kilogram basis, Commerce compared and treated as comparable flanges with greatly different per piece weights.

Commerce considers differences in physical characteristics of similar merchandise pursuant to 19 U.S.C. § 1677b(a)(6)(C)(ii)[20] and 19 C.F.R. §351.411 (1999).[21] In response to

---

[20] Section 1677b deals with determining the normal value and requires a fair comparison between the export price or constructed export price and normal value. The price is increased or decreased by the amount of any "difference (or lack thereof) between the export price or constructed export price and the price . . . that is established to the satisfaction of the

Plaintiff's arguments, Defendant states that Plaintiff's concerns regarding the comparison of dissimilar merchandise are addressed by including size among the comparison criteria, and using the DIFMER to remove those results that were greater than 20 percent. Defendant's Opposition at 25. The DIFMER adjustment to normal value is used to account for the differences in cost attributable to differences in physical characteristics between merchandise. Defendant claims that "Commerce explained in the <u>Final Results</u> as well as in earlier decisions, why weight is a better basis in this type of scenario." Defendant's Opposition at 22.

---

administering authority to be wholly or partly due to–

> (i) the fact that the quantities in which the subject merchandise is sold or agreed to be sold to the United States are greater than or less than the quantities in which the foreign like product is sold, agreed to be sold, or offered for sale,

> (ii) the fact that merchandise described in subparagraph (B) or (C) of section 1677(16) of this title is used in determining normal value, or

> (iii) other differences in the circumstances of sale.

19 U.S.C. § 1677b(a)(6)(C)(ii).

[21] Sec. 351.411 Differences in physical characteristics.

> (a). In comparing United States sales with foreign market sales, the Secretary may determine that the merchandise sold in the United States does not have the same physical characteristics as the merchandise sold in the foreign market, and that the difference has an effect on prices. In calculating normal value, the Secretary will make a reasonable allowance for such differences. (See section 773(a)(6)(C)(ii) of the Act.)

> (b). Reasonable allowance. In deciding what is a reasonable allowance for differences in physical characteristics, the Secretary will consider only differences in variable costs associated with the physical differences. Where appropriate, the Secretary may also consider differences in the market value. The Secretary will not consider differences in cost of production when compared merchandise has identical physical characteristics.

In past flange cases, Commerce calculated the dumping margin on a cost-per-piece basis. Commerce has previously determined that weight was a better basis for comparison in steel cases where the product was sold based on its weight. Plaintiff's products are not priced strictly according to weight but rather the amount of machining and finishing involved. Therefore, Commerce's decision in Corrosion-Resistant Steel Plate and its decision in Stainless Steel Flanges do not appear to be analogous.

Plaintiff claims that had its merchandise been compared on cost-per-piece basis, rather than Commerce's cost-per-kilogram basis, the comparisons Commerce made would not have passed the DIFMER margin. Hence, Plaintiff claims that the resulting differences, between DIFMER done on a per-piece-basis and DIFMER calculated on a cost-per-kilogram basis, are indicative of an improper comparison by Commerce. The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620, 86 S. Ct. 1018, 1026, 16 L. Ed. 2d 131, 141 (1966). As long as the agency's decisions are rational, the Court may not substitute its judgment for that of the agency. American Silicon Techs. v. United States, 23 CIT 589, 591, 63 F. Supp. 2d 1324, 1326 (1999). Thus, the court does not find that Commerce may not make weight comparisons of flanges. However, the record evidence provided by Plaintiff indicates that Commerce made an erroneous assumption regarding the comparability of rough forgings and proof and fully machined flanges in this review. If Commerce decides to use weight on remand, it must ensure that it is in fact comparing the most similar products and that its methodology and reasoning comport with its results.

The record does not contain sufficient evidence of the comparability of ASTM standard

forgings and DIN standard flanges.  In addition, Commerce's explanation for its comparison of rough forgings and finished flanges on a cost-per-kilogram basis, based upon the Defendant's stated reasoning that a heavier forging that weighs more cost more than the same standard good in a fully finished state, is inaccurate.  The evidence presented and verified by Commerce indicates that the cost of production is substantially different when comparing ASTM forgings to DIN flanges on a cost-per-kilogram and cost-per-piece basis.  While inconsistent results are permitted, Commerce must base its determinations on substantial evidence.  Plaintiff has presented sufficient evidence to support the conclusion that Commerce's new cost-per-kilogram methodology and comparison of rough forgings to finished flanges is distortive, and thus, unreasonable.  While Commerce has discretion to determine and apply a methodology necessary to yield similar merchandise comparisons under 19 U.S.C. § 1677(16), when such patent inconsistencies appear in Commerce's determination, it may not be upheld.  See Koyo, 66 F.3d at 1209.

## V.
## Conclusion

This court is vested with the power to order a remand to Commerce pursuant to 28 U.S.C. § 2643(c)(1) (1994).  For the reasons stated above, this determination is remanded to Commerce. The remand results are due within 90 says from the date of this opinion; Plaintiff  shall have 30 days thereafter within which to file comments; and Commerce may reply within 11 days of Plaintiff's filing.

_____
Evan J. Wallach, Judge

Date:    September 3, 2003
         New York, New York

37