**KOYO SEIKO CO., LTD. and Koyo Corporation of U.S.A., Plaintiffs–Appellees,**

v.

**The UNITED STATES, Defendant– Appellant,**

and

**The Timken Company, Defendant.**

No. 94–1363.

United States Court of Appeals, Federal Circuit.

Sept. 20, 1995.

D. Christine Wood, Powell, Goldstein, Frazer & Murphy, Washington, DC, argued, for plaintiffs-appellees. On the brief were Peter O. Suchman and Susan P. Strommer.

Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, U.S. Department of Justice, Commercial Litigation Branch, Civil Division. Velta A. Melnbrencis, Assistant Director, Civil Litigation Branch, Civil Division, Washington, DC, argued, for defendant-appellant. Of counsel were Stephen J. Powell, Chief Counsel, Berniece A. Browne, Senior Counsel, and Linda S. Chang, Attorney–Advisor, Office of Chief Counsel for Import Administration, U.S. Department of Commerce, Washington, DC.

Before ARCHER, Chief Judge, SKELTON, Senior Circuit Judge, and SCHALL, Circuit Judge.

SCHALL, Circuit Judge.

The United States appeals the September 21, 1993 decision of the United States Court of International Trade in *Koyo Seiko Co. v. United States*, 834 F.Supp. 431 (Ct.Int'l Trade 1993). In its decision, the court held that the International Trade Administration ("ITA") of the Department of Commerce ("Commerce") erred in one aspect of its calculation of final dumping margins for certain entries by Koyo Seiko Co., Ltd. and Koyo Corp. of U.S.A., Inc. (collectively "Koyo").[1] Because the court erred by failing to defer to Commerce's reasonable interpretation of the statutory provisions at issue, we affirm in part, reverse in part, and remand.

## BACKGROUND

### I. *The Calculation of Antidumping Duties*

Under the statutory provision governing the imposition of antidumping duties, Commerce is required to impose additional duties on imported merchandise that is being sold, or is likely to be sold, in the United States at less than fair value to the detriment of a domestic industry. 19 U.S.C. § 1673 (1988).[2]

---

1. The Timken Company, a defendant below, is not a party to this appeal.

2. After proceedings in the Court of International Trade and briefing in this court were completed, the relevant statutes, 19 U.S.C. §§ 1673, 1677,

See *Smith–Corona Group v. United States,* 713 F.2d 1568, 1571, 1 Fed.Cir.(T) 130, 132 (1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984). Commerce imposes a duty, otherwise known as the "dumping margin," equal to the "amount by which the foreign market value exceeds the United States price for the merchandise." 19 U.S.C. § 1673 (1988).[3] Foreign market value, or "FMV," is the "price ... at which such or similar merchandise is sold ... in the principal markets of the country from which exported." 19 U.S.C. § 1677b(a)(1) (1988). If Commerce cannot determine FMV on the basis of market prices, then FMV may be the constructed value ("CV") of the merchandise. *See* 19 U.S.C. § 1677b(a)(2) (1988) ("If ... the foreign market value of imported merchandise cannot be determined ... then ... the foreign market value of the merchandise may be the constructed value of that merchandise.").[4] Before Commerce can compare the United States price, or "USP," to the FMV of the imported merchandise, it first must determine what merchandise is "such or similar" to that sold in the United States.[5] In short, Commerce must "match" the U.S. product to a similar home-market product. The central issue in this case is whether the

Court of International Trade erred in failing to defer to Commerce's chosen methodology for determining, and its determination of, what is "such or similar" merchandise under 19 U.S.C. § 1677b.

## II. *Facts of the Case*

In 1986, Commerce initiated an antidumping investigation of certain tapered roller bearings (TRBs) from various countries. *Tapered Roller Bearings and Parts Thereof, and Certain Housings Incorporating Tapered Rollers From Hungary, Italy, Japan, The People's Republic of China, Romania, and Yugoslavia,* 51 Fed.Reg. 31732 (Dep't Comm.1986). The investigation covered TRBs with a wide range of uses. Koyo Seiko Co., Ltd. manufactures TRBs in Japan and exports them to the United States, and its affiliate Koyo Corp. of U.S.A. sells them in the United States. During the less-than-fair-value investigation of TRBs from Japan, Commerce considered comments regarding the factors that should be considered in determining which TRBs sold in the home market should be matched with the TRBs sold in the United States.

and 1677b, were amended. The amendments that were made do not affect either the outcome or the analysis in this case. Where there has been a change to a statutory provision that we discuss, however, we note it. For ease of reference, we speak in the present tense when referring to the statutes in their pre-amended form.

3. 19 U.S.C. § 1673 has been amended to substitute the words "normal value" for "foreign market value" and "export price (or the constructed export price)" for "United States price." 19 U.S.C. § 1673 (1994).

4. 19 U.S.C. § 1677b has been amended to substitute the words "normal value" for "foreign market value" and "subject merchandise" for "imported merchandise." 19 U.S.C. § 1677b(a)(4) (1994).

5. The term "such or similar merchandise" is defined as follows:

The term "such or similar merchandise" means merchandise in the first of the following categories in respect of which a determination for purposes of part II of this subtitle can be satisfactorily made:
(A) The merchandise which is the subject of an investigation and other merchandise

which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise.
(B) Merchandise—
(i) produced in the same country and by the same person as the merchandise which is the subject of the investigation,
(ii) like that merchandise in component material or materials and in the purposes for which used, and
(iii) approximately equal in commercial value to that merchandise.
(C) Merchandise—
(i) produced in the same country and by the same person and of the same general class or kind as the merchandise which is the subject of the investigation,
(ii) like that merchandise in the purposes for which used, and
(iii) which the administering authority determines may reasonably be compared with that merchandise.
19 U.S.C. § 1677(16) (1988).
Section 1677(16) has been revised by the substitution of "foreign like product" for "such or similar merchandise" and the deletion of the phrase "which is the subject of an investigation" from subsections (A) and (B). 19 U.S.C. § 1677(16) (1994).

In due course, Commerce selected six criteria that it used to match U.S. TRBs with home-market TRBs:

1) the outside diameter ("OD") of the bearing;

2) the inside diameter ("ID") of the bearing;

3) the width ("W") of the bearing;

4) the type of bearing in terms of its physical

characteristics, including the number of rows of rollers, flanges, seals, configurations of multiple rows of rollers, and whether the bearing is heat treated;

5) the dynamic, or basic load rating ("BLR"),

which is the constant stationary load that the bearing can endure for one million revolutions of the inner ring; and

6) the Y factor, which measures the effect of

thrust loads on the expected life of a bearing.

*Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan,* 52 Fed.Reg. 30700, 30701–02 (Dep't Comm.1987) (final determination). The fourth factor is not quantified by a single number for purposes of statistical analysis, and thus the remaining five factors are referred to as the "five criteria."

In the less-than-fair-value investigation, Commerce compared each U.S. TRB model to all TRB models in the home market for which the deviation for each of the five criteria was ten percent or less. *Id.* at 30702. (That is, if any home-market TRB differed from the U.S. model by more than ten percent in any of the five criteria, that home-market TRB was not considered to be "such or similar" merchandise for purposes of calculating the antidumping duty.) From that group of similar home-market TRBs, Commerce then selected, as the most similar

TRB, the home-market TRB model with the criterion whose greatest degree of deviation from the same criterion in the U.S. model was nevertheless smaller than the greatest degree of deviation in any of the other similar TRBs.[6] *Id.* Where there was a deviation in only one factor, Commerce compared TRBs for which the deviation was slightly over ten percent. *Id.* This method of matching U.S. TRBs with home-market TRBs is referred to as the "greatest-single-deviation" methodology. Eventually, Commerce made a final determination on the dumping of TRBs.[7] *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan,* 52 Fed.Reg. 30700, 30701–02 (Dep't Comm.1987) (final determination).

In March of 1989, Commerce initiated the first administrative review of TRBs from Japan covering the period from March 27, 1987, through September 30, 1988. *Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 54 Fed.Reg. 9868 (Dep't Comm.1989).[8] After initially using the greatest-single-deviation methodology previously described, Commerce changed to a "sum-of-the-deviations" methodology for matching U.S. TRBs with home-market TRBs. *See Tapered Roller Bearings, Finished and Unfinished, and Parts Thereof, From Japan,* 56 Fed.Reg. 41508, 41509 (Dep't Comm.1991) (final admin. review). This methodology compared the matched TRBs in each of the five criteria without using any limitation or "cap" on the deviation of any one criteria, and chose as the best match the TRB model for which the sum of the deviations was the lowest. *Id.*

Koyo contended during the administrative review that without a ten percent cap on deviations for each of the five criteria, certain matches resulted in the comparison of products that look very different, have dissimilar components, construction, and capabilities, and are used by different customers for dif-

---

**6.** For example, if two home market TRBs had deviations of 6%, 5%, 5%, 5%, and 5%, and 7%, 4%, 4%, 4%, and 4% for the five criteria, respectively, the first TRB would be chosen as a match under this methodology because the greatest deviation of the first TRB (6%) is smaller than the greatest deviation of the second TRB (7%).

**7.** *See* 19 U.S.C. § 1673d (1988); 19 C.F.R. § 353.20 (1995) (governing final determinations).

**8.** *See* 19 U.S.C. § 1675 (1988); 19 C.F.R. § 353.22 (1995) (governing administrative review of antidumping orders).

ferent purposes. *Id.* at 41510–11. Koyo contended that models used for different purposes are priced for sale in different markets, and therefore are not approximately equal in commercial value. *Id.* at 41511. Koyo also contended that TRB models with more than an insignificant deviation in any one or more of the critical criteria will not normally be considered commercially similar. *Id.* In short, Koyo argued that Commerce could only be assured of matching "such or similar" TRBs if it used the ten percent cap on each of the five criteria used in the sum-of-the-deviations methodology. Commerce rejected Koyo's contentions, and used the sum-of-the-deviations methodology, without a ten percent cap, to match TRBs. *Id.* Commerce found a dumping margin for Koyo TRBs of 36.2 percent *ad valorem.*

Koyo commenced suit in the Court of International Trade contesting the final results of the 1987–1988 administrative review. Among other things, Koyo argued that Commerce should have continued to use the greatest-single-deviation methodology it had used in the less-than-fair-value investigation that resulted in the final dumping determination. Koyo further contended that, with that methodology, Commerce should have used a ten percent cap. On September 21, 1993, the court ruled on Koyo's motion for judgment on the agency record. The court stated:

> Koyo concedes that both methodologies are capable of generating comparisons of such or similar merchandise; however, it further states that there is a limit on the permissible deviation of the criteria used to match TRB models and, therefore, Commerce should use the ten percent cap.

> Commerce claims that the ten percent cap is not necessary as it would eliminate from use as comparison models home market sales which overall are most similar to the United States TRBs.

> This Court affirms Commerce's switch in methodologies; *nevertheless, the Court feels that the new methodology must be used in conjunction with the ten percent cap* to limit the permissible deviation of the criteria used to [match] TRB models. Commerce used the cap in its original less than fair value determination and its use

> avoids comparisons between products which differ so dramatically that they simply cannot be considered commercially similar.

*Koyo,* 834 F.Supp. at 435 (emphasis added). Accordingly, the court granted Koyo's motion in part, remanding the case to Commerce to apply the ten percent cap in conjunction with the sum-of-the-deviations methodology.

On remand, Commerce reapplied the sum-of-the-deviations methodology, while also excluding any home-market TRB that exceeded the U.S. model by more than ten percent in any of the five criteria. Commerce imposed a dumping margin of 30.19 percent *ad valorem.* Thereafter, the Court of International Trade entered a final order affirming Commerce's calculation, and dismissing the case. The government contests that portion of the court's September 21, 1993 judgment that requires Commerce to apply the ten percent cap in conjunction with the sum-of-the-deviations methodology.

## DISCUSSION

### I. *Standard of Review*

The standard of review that the Court of International Trade applies to an antidumping duty determination is set forth in 19 U.S.C. § 1516a(b)(1)(B) (1988). *NEC Home Elecs., Ltd. v. United States,* 54 F.3d 736, 742 (Fed.Cir.1995). That statute provides that the ITA's determination will be affirmed unless it is unsupported by substantial evidence or otherwise not in accordance with law. *Id.* "[T]o determine whether the Court of International Trade correctly applied [its] standard [of review] in reaching its decision, this court must apply anew the statute's express standard of review to the agency's determination." *Id.* (quoting *PPG Indus., Inc. v. United States,* 978 F.2d 1232, 1236 (Fed.Cir. 1992)). Thus, we must affirm the Court of International Trade if Commerce's final results in the 1987–1988 administrative review are unsupported by substantial evidence or otherwise not in accordance with law.

### II. *Analysis*

#### A.

The facts are not in dispute. The sole issue in the case is whether Commerce's use

of the sum-of-the-deviations methodology without a ten percent cap violates the statute. We begin our analysis with an examination of the relevant statutory provisions. *See VE Holding Corp. v. Johnson Gas Appliance Co.*, 917 F.2d 1574, 1579 (Fed.Cir.1990) ("It is axiomatic that statutory interpretation begins with the language of the statute."), *cert. denied*, 499 U.S. 922, 111 S.Ct. 1315, 113 L.Ed.2d 248 (1991). The statutory provision defining "such or similar" merchandise is silent with respect to the methodology that Commerce must use to match a U.S. product with a suitable home-market product. *See* 19 U.S.C. § 1677(16) (1988). This is not surprising, given that the model-match methodology for comparing one type of product, such as TRBs, would not be relevant to the model-match methodology for other products, such as motorcycles or paint. Congress has not addressed in the statute the issue of how Commerce is to match U.S. TRBs with "such or similar" home-market TRBs.

### B.

Where Congress has not directly addressed the precise question at issue, a court "does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). Instead, under *Chevron*, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* The parties dispute, as a threshold matter, whether *Chevron* applies to this case.

Koyo contends that *Chevron* does not apply, because Congress has not left a gap in the antidumping law for Commerce to fill. According to Koyo, the Court of International Trade properly concluded that the methodology chosen by Commerce for matching U.S. and home-market TRBs did not produce matches of "such or similar" merchandise on which to base the calculation of dumping margins, as required by 19 U.S.C. § 1677b. Koyo frames the precise question at issue as: "whether the U.S. and home market products

actually compared by [Commerce] in this administrative review" meet the "such or similar" requirement of the U.S.C. § 1677b. Because statutory interpretation is a question of law that the court decides without deference to any agency interpretation, Koyo argues, *Chevron* does not apply.

The government responds that *Chevron* does apply, because the statute requiring Commerce to select and compare "such or similar" merchandise "does not detail the methodology that is to be used in determining what constitutes 'similar' merchandise." In the government's view, this means that Congress has granted Commerce "discretion to make policy decisions regarding which home market models are properly comparable with U.S. models" under the statute. According to the government, this implicit legislative delegation of authority invokes *Chevron*, and under *Chevron*, the court should have deferred to Commerce's reasonable choice of model-match methodologies.

■ We agree with the government that Congress has implicitly delegated authority to Commerce to determine and apply a model-match methodology necessary to yield "such or similar" merchandise under the statute. This Congressional delegation of authority empowers Commerce to choose the manner in which "such or similar" merchandise shall be selected. *Chevron* applies in such a situation. *See, e.g., Lasko Metal Prods., Inc. v. United States*, 43 F.3d 1442, 1446 (Fed.Cir.1994) ("In situations in which a statute does not compel a single understanding, the Supreme Court and this court have held that 'our duty is not to weigh the wisdom of, or to resolve any struggle between, competing views of the public interest, but rather to respect legitimate policy choices made by the agency in interpreting and applying the statute.' "); *Texas Crushed Stone Co. v. United States*, 35 F.3d 1535, 1541 (Fed.Cir.1994) (Congress did not unambiguously express an intent as to the test used to determine whether there had been a concentration of dumped imports in a particular region, and consequently this court "must defer to the [International Trade Commission's] interpretation of the statutory provi-

sion in question ... unless we find such interpretation to be unreasonable.").

We reject Koyo's contention that *Chevron* does not apply because the issue of whether merchandise matched by Commerce is "such or similar" under the statute is purely one of law. Under Koyo's approach, no court of first instance could ever accord *Chevron* deference to an agency determination made pursuant to an implicit delegation of authority under a statute, because the only issue would be a de novo review of whether the agency's determination complied with the governing statute. Although Koyo correctly argues that the court must determine whether the agency's interpretation ultimately complies with the statute, under *Chevron* that review is limited to whether "the agency's answer is based on a permissible construction of the statute," *Chevron*, 467 U.S. at 843, 104 S.Ct. at 2782, because an agency's statutory interpretation that is contrary to law is necessarily impermissible.

### C.

■ Under *Chevron*, in order to survive judicial scrutiny, an agency's construction need not be the only reasonable interpretation or the reading the court would have reached if the question initially had arisen in a judicial proceeding. *Chevron*, 467 U.S. at 843 n. 11, 104 S.Ct. at 2782 n. 11. In that regard, we have stated that the ITA is "the 'master' of antidumping law ... [and its decisions are] worthy of considerable deference." *Daewoo Elecs. Co. v. United States,* 6 F.3d 1511, 1516 (1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2672, 129 L.Ed.2d 808 (1994). Thus, our inquiry is limited to determining whether Commerce's model-match methodology, without the ten percent cap later required by the court, is reasonable. We conclude that it is.

■ Commerce's interpretation is reasonable because there is no evidence that any one of the five criteria should be decisive in determining whether to match a given U.S. TRB with a home-market TRB. By choosing not to apply the ten percent cap, Commerce in essence weights each of the five criteria equally, which is plainly reasonable.

■ Commerce's choice not to use the ten percent cap in connection with its sum-of-the-deviations methodology is also reasonable in view of the other safeguards used by Commerce to prevent matches of TRBs that are not "such or similar." For example, Commerce eliminated from its analysis any potential comparisons for which the difference in the variable costs between the home-market model and the target U.S. model exceeded twenty percent. 56 Fed.Reg. at 41509. Also, when the sum of the deviations was the same for two or more home-market models, Commerce compared the variable manufacturing costs for these models with the variable manufacturing costs for the U.S. model to select the most similar match. *Id.* Such analytical tools for matching TRBs, even in the absence of a ten percent cap on the individual criteria, render Commerce's model-match methodology reasonable.

Koyo argues that Commerce's interpretation is unreasonable because it results in the comparison of TRBs that are not commercially similar because they are used for very different purposes and sold in different markets. Koyo cites, as an example of this allegedly inequitable and statutorily improper result, Commerce's comparison of a U.S. model TRB "purchased by a major U.S. automobile company for use in the front wheel of a light truck, [which] is a comparatively high volume product sold in a very competitive market" with a Japanese TRB "typically used in heavy equipment such as an articulated off-highway wheel loader." We agree, however, with Commerce's view that, for purposes of calculating antidumping duties, it is not necessary "to ensure that home market models are technically substitutable, purchased by the same type of customers, or applied to the same end use as the U.S. model." 56 Fed.Reg. at 41511. It is not unreasonable for Commerce to view the described TRBs as "like ... in the purposes for which used." 19 U.S.C. § 1677(16)(B)(ii), (C)(ii). Matching "such or similar" home-market merchandise with certain U.S. merchandise is all that the statute requires; Koyo has not shown that Commerce's matching methodology represents an impermissible approach under the statute.

For the foregoing reasons, the Court of International Trade's modification of Commerce's model-match methodology was improper. Under *Chevron,* the court was bound to defer to Commerce's permissible construction of the statute. *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782.

## CONCLUSION

For the foregoing reasons, we reverse that portion of the September 21, 1993 judgment of the Court of International Trade requiring Commerce to impose a ten percent cap to each of the five criteria used to match U.S. TRBs with home-market TRBs. We affirm the remainder of the judgment. The case is remanded for further proceedings consistent with this opinion.

## COSTS

Each party shall bear its own costs.

*AFFIRMED IN PART, REVERSED IN PART, and REMANDED.*