91 F.3d 169
 NOTICE: Federal Circuit Local Rule 47.6(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
NTN BEARING CORPORATION OF AMERICA, American NTN Bearing
Manufacturing Corporation, and NTN Corporation,
Plaintiffs-Appellants,
v.
The UNITED STATES, United States Department of Commerce, and
Mickey Kantor, Secretary of Commerce, Defendants-Appellees,
and
The Timken Company, Defendant-Appellee.
 No. 95-1478.
 United States Court of Appeals, Federal Circuit.
 Decided: June 4, 1996.
 
 Before MAYER, SCHALL and BRYSON, Circuit Judges.
 PER CURIAM.
 
 
 1
 NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corporation, and NTN Corporation (collectively "NTN") appeal the judgment of the United States Court of International Trade, NTN Bearing Corporation of America v. United States, 888 F.Supp. 1210 (Ct. Int'l Trade 1995), affirming the final remand results of the United States Department of Commerce's (Commerce) third administrative review of the antidumping duty order covering tapered roller bearings, and parts thereof (TRBs), from Japan. We affirm.
 
 
 2
 Commerce's administrative review determinations must be sustained unless they are unsupported by substantial evidence or are not in accordance with law. Zenith Elecs. Corp. v. United States, 77 F.3d 426, 430 (Fed.Cir.1996). Substantial evidence " 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 933 (Fed.Cir.1984) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197 (1938)). Moreover, we must defer to Commerce's interpretation of the antidumping statute as long as it is reasonable, even if we might prefer a different interpretation. See Zenith, 77 F.3d at 430. NTN has not demonstrated that Commerce's determinations are unsupported by substantial evidence or are otherwise not in accordance with law. Nor has it shown that Commerce's interpretations of the antidumping statute at issue here are unreasonable.
 
 
 3
 NTN raises three issues on appeal. First, it argues that Commerce used inadequate quantities of home market sales in determining foreign market value. Second, it claims that Commerce's comparison of bearings with different designs in calculating duties was not in accordance with law. Third, NTN asserts that Commerce improperly applied its twenty percent cost test in matching home market bearings with United States market bearings by failing to account for the two separate sets of cost data it submitted for the different fiscal periods covered by the review.
 
 
 4
 The government concedes that NTN raised the first issue in its motion for judgment on the agency record, but argues that NTN cited no home market bearings that allegedly had been improperly relied upon in determining foreign market value until after the final remand results were submitted to the court. It claims, therefore, that because NTN failed to exhaust its administrative remedies, we should not consider the issue. The parties disagree, however, on whether the data upon which NTN now bases its argument was available to it prior to the publication of the final remand results. Rather than attempt to resolve that dispute, we will address the merits.
 
 
 5
 The antidumping statute in effect during the review period imposed upon Commerce a duty to determine whether home market sales were made at less than the cost of production when it had reasonable grounds to believe that to be the case. 19 U.S.C. § 1677b(b) (1988). The statute also required Commerce to disregard such sales in determining foreign market value if the sales were made over an extended period and in substantial quantities, and if they were not at prices that permitted the recovery of all costs within a reasonable period of time in the normal course of trade. Id. When Commerce disregarded such below-cost sales, and when it determined the remaining home market sales "to be inadequate as a basis for the determination of foreign market value," then the statute required Commerce to use constructed value to determine foreign market value. Id. (emphasis added).
 
 
 6
 Congress has neither defined the term "inadequate" nor specified how Commerce should determine adequacy. Under such circumstances, we must defer to Commerce's interpretation of section 1677b, unless NTN demonstrates it is not reasonable. See Zenith, 77 F.3d at 432. Here, Commerce applied what it calls the "10/90/10" test to determine whether NTN's above-cost home market sales were "inadequate." Under that test, if between 90% and 100% of NTN's home market sales for a model were below the cost of production, and the below-cost sales occurred over an extended period, Commerce considered the remaining above-cost sales to be "inadequate" and used constructed value to calculate foreign market value. Otherwise, it did not consider home market sales to be "inadequate" and used either all or a portion of those sales to calculate foreign market value.
 
 
 7
 NTN has not established that this approach is unreasonable. The record belies NTN's assertion that Commerce failed to determine the adequacy of above-cost sales here; it applied the "10/90/10" test. Moreover, NTN's argument that Commerce was not permitted to compare "large quantities of a particular model sold in the U.S. to small quantities of a model sold in the home market," finds no support in the statute. NTN has not shown, therefore, that Commerce's utilization of the "10/90/10" test was unreasonable.
 
 
 8
 NTN next argues that Commerce impermissibly compared bearings with different designs, specifically high precision and normal precision bearings, in calculating dumping margins. This allegation, which the trial court rejected, questions whether Commerce compared products sold in the United States with "such or similar merchandise" sold in the home market. While the antidumping statute defines "such or similar merchandise," 19 U.S.C. § 1677(16) (1988), it "is silent with respect to the methodology that Commerce must use to match a U.S. product with a suitable home-market product." Koyo Seiko Co. v. United States, 66 F.3d 1204, 1209 (Fed.Cir.1995). Thus, our inquiry is again limited to whether Commerce's applied methodology was reasonable. See Zenith, 77 F.3d at 432.
 
 
 9
 We have previously held that the methodology Commerce used here, the "sum-of-the-deviations" methodology, is reasonable. Koyo Seiko, 66 F.3d at 1210. Notwithstanding, NTN complains that "design type" was not one of the criteria examined under that methodology, and its absence resulted in Commerce examining radically different bearings. While it may be correct that high precision bearings are physically different from, and are used for different purposes than, normal precision bearings, that does not preclude their comparison under the antidumping statute. It is unnecessary for Commerce to ensure that home market models and United States models are technically substitutable, purchased by the same customers, or have the same end uses. Id. Moreover, it was not unreasonable for Commerce to decline to consider bearing design type as part of its methodology because fewer than all of the parties agreed that it should be a criterion. The sum-of-the-deviations methodology coupled with the twenty percent variable cost test, which we have held to be a reasonable safeguard "used by Commerce to prevent matches of TRBs that are not 'such or similar,' " id., was a reasonable way to identify which bearings to compare. That Commerce has instructed respondents in other bearings cases not to compare bearings with different precision ratings does not compromise the reasonableness of the methodology applied here.
 
 
 10
 Finally, NTN argues that Commerce performed its twenty percent variable cost test improperly because it did not account for the fact that NTN submitted costs for two separate fiscal periods during the review. However, NTN did not raise this argument until after Commerce had submitted its final remand results to the Court of International Trade. Before that court, NTN stated that while this alleged "error may have been discoverable by NTN during the original review, it was simply not discovered at that time." On appeal, NTN again does not argue that the data was unavailable prior to Commerce filing its remand results; it states simply that it "did not see Commerce's error until the remand results were issued." Under these circumstances, the court did not address the merits of this issue, nor will we. See IPSCO, Inc. v. United States, 965 F.2d 1056, 1061-62 (Fed.Cir.1992) (rejecting an allegation, first made after Commerce had completed its investigation pursuant to the court's second remand order, that Commerce had relied on incorrect data in determining foreign market value where the discovery of the alleged error could have been made earlier through due diligence and no reasonable excuse was offered for the failure to do so); Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed.Cir.1990) (rejecting an argument raised for the first time before the Court of International Trade as "unjust" to Commerce and "wasteful of public resources").