# United States Court of Appeals for the Federal Circuit

---

**THAI PLASTIC BAGS INDUSTRIES CO., LTD.,**
*Plaintiff-Appellant,*

**v.**

**UNITED STATES,**
*Defendant-Appellee,*

AND

**POLYETHYLENE RETAIL CARRIER BAG COMMITTEE, HILEX POLY CO., LLC, AND SUPERBAG CORPORATION,**
*Defendants-Appellees.*

---

2013-1322

---

Appeal from the United States Court of International Trade in Nos. 11-CV-0090 and 11-CV 0086, Chief Judge Donald C. Pogue.

---

Decided: March 31, 2014

---

IRENE H. CHEN, Chen Law Group LLC, of Rockville, Maryland, argued for plaintiff-appellant.

RYAN M. MAJERUS, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of

Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were STUART F. DELERY, Assistant Attorney General, JEANNE E. DAVIDSON, Director, and PATRICIA M. MCCARTHY, Assistant Director. Of counsel on the brief was SCOTT D. MCBRIDE, Senior Attorney, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of Washington, DC.

DANIEL L. SCHNEIDERMAN, King & Spalding, of Washington, DC, argued for defendants-appellees. With him on the brief was JOSEPH W. DORN.

---

Before PROST, WALLACH, and CHEN, *Circuit Judges.*

WALLACH, *Circuit Judge.*

Appellant Thai Plastic Bags Industries, Co., Ltd. ("TPBI") appeals the decision of the United States Court of International Trade ("CIT") affirming the United States Department of Commerce's ("Commerce") Final Results of the Fifth Administrative Review of the Antidumping Duty Order covering polyethylene retail carrier bags ("PRCBs" or "subject merchandise") from Thailand. Appellees are the United States, Polyethylene Retail Carrier Bag Committee, Hilex Poly Co., LLC, and Superbag Corporation. Because the CIT properly found Commerce's determinations are supported by substantial evidence and in accordance with law, this court affirms.

## BACKGROUND

In September 2009, Commerce initiated the Fifth Administrative Review of the Antidumping Duty Order covering TPBI's subject merchandise during the 2008–2009 period of review. *See* Polyethylene Retail Carrier Bags From Thailand, 76 Fed. Reg. 12,700 (Dep't of Commerce Mar. 8, 2011) (final results of antidumping duty administrative review) ("Final Results"). The antidump-

ing statute governs the application of remedial duties to foreign merchandise sold, or likely to be sold, in the United States "at less than its fair value." 19 U.S.C. § 1673 (2006).

During administrative reviews, Commerce strives to create a fair comparison between the export price (or constructed export price) of a foreign producer's sales and its home market sales (or "normal value"). *See id.* § 1677b(a). Normal value is the price at which the foreign like product[1] is first sold in the exporting country, "in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price." *Id.* § 1677b(a)(1)(A), (B)(i). If the price of an item in the home market (normal value) is higher than the price for the same item in the United States (export price), then the comparison produces a positive number, indicating that dumping has occurred. *Id.* § 1677(35)(A) (The antidumping duty margin is "the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise.").

In calculating normal value, if Commerce "has reasonable grounds to believe or suspect that sales of the foreign like product . . . have been made at prices which represent less than the [cost of production ("COP")] of that product," Commerce "determine[s] whether, in fact, such sales were made at less than the [COP]." *Id.* § 1677b(b)(1). If so, and if certain other conditions are met, Commerce may disregard such sales in the determination of normal value ("the below-cost test"). If no foreign like product sales remain after conducting the

---

[1] Foreign like product is merchandise sold in a comparison market that is identical or similar to the subject merchandise. 19 U.S.C. § 1677(16).

below-cost test, Commerce may determine the normal value based on a constructed value ("CV") of the foreign like product. *Id.* § 1677b(a)(4). "Commerce uses the same method to calculate 'costs' for both COP and CV." *Thai Plastic Bags Indus. Co. v. United States* (*Thai Plastic I*), 853 F. Supp. 2d 1267, 1270 (Ct. Int'l Trade 2012). At issue is Commerce's method of calculating the normal value of TPBI's merchandise based on a CV, once Commerce determined that the sales in the exporting country of the foreign like product had been made at prices below the COP. When calculating the COP (for the below-cost test) and the CV,

> [c]osts shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles [("GAAP")] of the exporting country . . . and reasonably reflect the costs associated with the production and sale of the merchandise.

19 U.S.C. § 1677b(f)(1)(A).

Here, Commerce "disregarded the below-cost sales of TPBI" in the previous administrative review. Polyethylene Retail Carrier Bags from Thailand, 75 Fed. Reg. 53,953–54 (Dep't of Commerce Sept. 2, 2010) (preliminary results of antidumping duty administrative review) ("Preliminary Results"). Thus, Commerce had "reasonable grounds" to suspect "TPBI's sales of the foreign like product under consideration for the determination of normal value in this review may have been made at prices below the [COP]." *Id.*; *see* 19 U.S.C. § 1677b(2)(A)(ii). Accordingly, Commerce conducted a COP analysis of TPBI's sales in Thailand. In its initial questionnaire for the Fifth Review, Commerce requested that TPBI report its COP for the subject merchandise, and allocate those costs across the different products based on the physical characteristics of the products.

In its initial questionnaire response, TPBI reported its COP for the subject merchandise sold in the United States and Thailand. In doing so, TPBI assigned each product a unique control number ("CONNUM") and reported a per-unit COP for each CONNUM. TPBI reported the actual costs per job order for most of its incurred costs, and it allocated those actual costs on a per-unit basis by reference to the physical characteristics of individual CONNUMs.

For labor and overhead, however, TPBI's cost-accounting system calculated a per-kilogram average cost taken over a three-month period for all CONNUMs. TPBI's labor and overhead records reflected only the total conversion costs.[2] Therefore, TPBI's financial accounting system did not record labor and overhead costs (fixed and variable) on an actual product-specific (i.e., CONNUM-specific) level.[3]

---

[2] Conversion costs are the direct labor and overhead costs necessary to convert direct materials into finished goods. J.A. 4370 n.6.

[3] TPBI describes its system as follows:

The job order system also records the labor and overhead costs (fixed and variable) for the job order, *but not on an actual basis.* Instead, it is a single per Kg average for all labor and overhead for all production, both subject and non-subject merchandise, regardless of physical characteristics or actual costs. (Ink and oil (solvent) are included as consumables in variable overhead.) These averaged (*i.e.*, theoretical) labor and overhead costs are based on the costs and quantities from the previous three months. In other words, if a job order is produced in April, the raw materi-

Thus, "TPBI did not follow its normal cost-accounting system for purposes of reporting labor and overhead costs," and instead used a method for cost allocation for labor and overhead costs based on "machine times" (also referred to as "machine hours") derived from its accounting system. J.A. 5546. This method was created solely for the purpose of reporting to Commerce.

Subsequently, Commerce issued supplemental questionnaires requesting, inter alia, additional information pertaining to the cost-allocation methodology TPBI employed in reporting its labor and overhead costs. Commerce asked TPBI to report its "standard costs recorded in TPBI's normal books and records, adjusted to the actual costs," and explain why the reported costs for nine pairs of CONNUMs that were physically similar were "so different." J.A. 4803.

In response, TPBI claimed that actual costs were "driven by many variables, and not just physical characteristics." J.A. 4834. TPBI also explained "disparities in the production quantities between the compared CONNUM groupings," rather than physical characteristics, were "largely responsible for the cost differences."

---

al costs in Baht/Kg will be from April, but the labor and overhead costs in Baht/Kg will be based on a single weighted-average cost[] from January–March, regardless of product. Because this single simple Baht/Kg average quarterly cost for all labor and overhead is the same for all products, it does not reflect either physical or production (*i.e.*, output) differences associated with each product, and thus would distort CONNUM costs by not reflecting any difference in physical characteristics.

J.A. 193 (emphasis added).

J.A. 4835. TPBI listed some of the variables as "production efficiencies and different costs structures at each factory, as well as the day-to-day requirements of individual production runs and customer orders." J.A. 4834. TPBI proposed another allocation method based on production output, which was derived from TPBI's accounting system, and again, was developed solely for the purpose of reporting to Commerce.

In September 2010, Commerce published its Preliminary Results, where it determined that TPBI's reported allocation methodology "unreasonably distort[ed]" the cost of manufacturing for the subject merchandise and the foreign like product. Preliminary Results, 75 Fed. Reg. at 53,955. Specifically, Commerce found the reported methodologies were "inconsistent with the methodology applied by TPBI in its books and records," and "result[ed] in a large variability in costs that have nothing to do with physical differences in the merchandise." *Id.* Commerce instead weight-averaged TPBI's labor and overhead costs "on a per unit basis" to prevent those significant costs differences between physically similar merchandise. *Id.* Commerce relied on an analysis similar to a "DIFMER" ("difference in physical characteristics" or "difference-in-merchandise") application, even though the terms of the DIFMER regulation apply to calculating price, not costs.[4] Specifically, Commerce "recalculated [TPBI's] costs by averaging them in order to prevent large discrepancies in costs between merchandise that was physically similar." *Thai Plastic I*, 853 F. Supp. 2d at 1273. Commerce then

---

[4]    Commerce typically uses the DIFMER principle in its analysis of what constitutes "a reasonable allowance" for differences in the physical characteristics between products sold in the United States and those sold in foreign markets. *See* 19 C.F.R. § 351.411(b) (2006).

factored in these adjusted costs in determining the COP and the CV for the "normal value" of the subject merchandise. After calculating costs, Commerce also applied a DIFMER adjustment pursuant to the DIFMER regulation, explaining "[b]ecause we assigned the same conversion costs to all models, any DIFMER adjustment[] we calculate is based solely on the differences in the costs of materials." J.A. 5549.

Commerce published the Final Results on March 8, 2011, in which it continued to reject TPBI's reported conversion costs, concluding that TPBI's methodology did not reasonably reflect actual costs because it "results in products with few or minor physical differences having significantly different [costs of manufacturing] assigned to them." J.A. 5545; *see Thai Plastic I*, 853 F. Supp. at 1271. As a result, Commerce applied its alternate cost methodology, as "facts otherwise available"[5] pursuant to 19 U.S.C. § 1677e(a), and reallocated TPBI's reported costs by weight-averaging them across all product lines to diminish the distortions in TPBI's reported cost allocations. Based on its analysis, Commerce found TPBI's normal value exceeded its export price to the United

---

[5]    Under 19 U.S.C. § 1677e(1)–(2),

If—(1) necessary information is not available on the record, or (2) an interested party or any other person . . . fails to provide such information by the deadlines for submission of the information or in the form and manner requested, . . . [or] provides such information but the information cannot be verified . . . , [Commerce] shall . . . use the facts otherwise available in reaching the applicable determination under this subtitle.

States, and it calculated the applicable antidumping duty margin.

TPBI challenged the Final Results before the CIT, alleging Commerce erroneously rejected its proposed cost-allocation methodologies on the sole basis that TPBI's reported labor and overhead costs were not associated with the physical characteristics of the merchandise. It contended Commerce should have used TPBI's reported labor and overhead costs to calculate the COP and CV. TPBI also argued that Commerce should have considered other quantitative and qualitative factors in determining the cost drivers, and that by failing to do so, Commerce's analysis in the Final Results was neither supported by substantial evidence nor in accordance with law. TPBI also made two arguments related to DIFMER: first, that Commerce "misapplied the DIFMER standard . . . in improperly weight-averaging conversion cost differences across all products" and, second, "by calculating the DIFMER adjustment to normal value based solely on cost differences in materials." J.A. 5577–78.

On June 18, 2012, the CIT affirmed Commerce's calculation of normal value. *Thai Plastic I*, 853 F. Supp. 2d at 1269. It also found that "TPBI did not offer any meaningful evidence to explain why physical differences in the CONNUM pairs resulted in such large differences in conversion costs. As cost allocation based on physical characteristics is a primary factor in Commerce's analysis, Commerce may adjust a company's allocation method to more reasonably reflect costs." *Id.* at 1273. However, the CIT remanded to Commerce for reconsideration of multiple issues not relevant to this appeal. Commerce then issued its Remand Results, which the CIT affirmed on February 11, 2013. *Thai Plastic Bags Indus. Co. v. United States* (*Thai Plastic II*), 895 F. Supp. 2d 1337, 1340, 1346 (Ct. Int'l Trade 2013).

TPBI timely appealed the portions of the CIT's decision in *Thai Plastic I* sustaining Commerce's rejection of TPBI's cost-allocation methodologies and Commerce's reallocation of TPBI's conversion costs. This court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(5) (2012).

DISCUSSION

I. Standard of Review

"Congress did not specify a standard of review for this court in reviewing judgments of the [CIT]." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350 (Fed. Cir. 2006). Therefore, this court has adopted the "substantial evidence" standard prescribed for the CIT at 19 U.S.C. § 1516a(b)(1)(B)(i), which requires upholding Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."

"Although such review amounts to repeating the work of the [CIT], we have noted that 'this court will not ignore the informed opinion of the [CIT].'" *Diamond Sawblades Mfrs. Coal. v. United States*, 612 F.3d 1348, 1356 (Fed. Cir. 2010) (quoting *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 983 (Fed. Cir. 1994) ("Although reviewing anew the [International Trade Commission's] determination, this court will not ignore the informed opinion of the [CIT]. That court reviewed the record in considerable detail. Its opinion deserves due respect.")); *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007) ("When performing a substantial evidence review, . . . we give great weight to the informed opinion of the [CIT]. Indeed, it is nearly always the starting point of our analysis." (internal quotation marks and citation omitted)). To the extent a CIT decision is based on a question of law, such as statutory interpretation, this court's review is de novo. *F.lli De Cecco Di Filippo Fara S. Martino S.p.A v. United States*, 216 F.3d 1027, 1031 (Fed. Cir. 2000).

In determining whether Commerce correctly construed provisions of the antidumping statute, the court is guided by *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). If "Congress has directly spoken to the precise question at issue . . . the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. If the statute is silent or ambiguous with respect to the specific issue, the relevant question is whether Commerce's interpretation "is based upon a permissible construction of the statute." *Id.* at 843. In other words, Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous." *See United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009) (citation omitted).

## II. Commerce Was Not Required to Accept TPBI's Reported Costs

On appeal, TPBI argues Commerce improperly rejected its labor and overhead costs in calculating the COP and CV. TPBI insists its records "were kept in accordance with [the] GAAP of Thailand." Appellant's Br. 11–12. These production costs, according to TPBI, were then allocated to each CONNUM using machine time and production output as benchmarks. Commerce rejected these reported costs as unreliable and unreflective of production costs.

The relevant statute provides that "[c]osts shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the [GAAP] of the exporting country . . . and *reasonably reflect the costs* associated with the production and sale of the merchandise." 19 U.S.C. § 1677b(f)(1)(A) (emphasis added). TPBI contends that under a *Chevron* prong-one analysis, the statute is unambiguous and directs Commerce to use TPBI's own records,

which TPBI maintains are consistent with the GAAP of Thailand. To TPBI, the plain language of the statute "runs directly contrary to Commerce's position that cost differences among products must be supported by corresponding differences in physical characteristics." Appellant's Br. 20. Appellees counter that Commerce's actions were consistent with the statute and substantial evidence supported Commerce's finding that TPBI's alternative cost methodologies did not "reasonably reflect" TPBI's costs in producing and selling the subject merchandise. The CIT determined Commerce's finding that TPBI's methodologies produced "'great variability' in the costs of similar items having nothing to do with the physical aspects of the specific product" was supported by the record. *Thai Plastic I*, 853 F. Supp. 2d at 1272.

Section 1677b(f)(1)(A) does not require Commerce to accept TPBI's records. It requires only that reported costs must "normally" be used if they are "based on the records . . . kept in accordance with the [GAAP]" *and* "reasonably reflect" the costs of producing and selling the merchandise. *Id.* TPBI's records met neither criterion. Commerce reasonably interpreted its statutory obligation, and its underlying findings are supported by substantial evidence.

First, there is no evidence that TPBI's labor and overhead records were kept in accordance with the GAAP of Thailand. TPBI provided COP allocations based on physical characteristics for direct material costs, but claims that for the fixed and variable labor and overhead costs there were no records reflecting the CONNUM-level data Commerce requested since TPBI did not keep such records. In its normal accounting system, TPBI calculates a "single per Kg average for all labor and overhead for all production, both subject and non-subject merchandise, regardless of physical characteristics or actual costs" over a three-month period. J.A. 193, 5545. In providing the information Commerce requested, TPBI departed from its

normal accounting practice because it found the proffered records reflected neither the physical nor output differences for each product. TPBI fashioned new methodologies in response to Commerce's questionnaires and failed to demonstrate that the methodologies were in accordance with the GAAP of Thailand. Indeed, TPBI submitted no evidence of what constitutes the Thai GAAP. Therefore, the reported costs were not "based on the records . . . kept in accordance with the [GAAP]," as the statute requires. *See* 19 U.S.C. § 1677b(f)(1)(A).

Second, Commerce properly found that TPBI's labor and overhead costs did not "reasonably reflect" production costs. In determining whether production costs are higher than home market sales, Commerce "calculate[s] costs consistent with the model matching criteria it develops [at the] outset of an investigation or review." *See* Antidumping Duties; Countervailing Duties: Notice of Proposed Rulemaking and Request for Public Comments, 61 Fed. Reg. 7,308, 7,339 (Dep't of Commerce Feb. 27, 1996) ("Preamble to Proposed Rules"). Congress has also stated that "costs shall be allocated using a method that reasonably reflects and accurately captures all of the actual costs incurred in producing and selling the product under investigation or review." Statement of Administrative Action accompanying the Uruguay Round Agreements Act, No. 103-316, at 834–35 (1994) ("Statement of Administrative Action"), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4172.

TPBI argues that because of § 1677b(f)(1)(A)'s language that "costs shall normally be calculated based on the records of the exporter or producer of the merchandise," Commerce should have accepted its records based on the machine time and production output benchmarks. TPBI asserted to Commerce that its reported costs based on the new methodologies were "directly attributable to the physical differences of the products." J.A. 5794.

Contrary to this assertion, Commerce discovered that nine CONNUM pairs were "very similar in terms of physical characteristics" but had substantial differences in costs. J.A. 4803. Commerce accordingly asked TPBI to "explain and demonstrate why the reported costs for these two models are so different." *Id.* Contradicting its own contention that the reported costs were "directly attributable" to physical differences, TPBI argued that several variables other than physical characteristics accounted for the cost differences between the CONNUM pairs, including whether the CONNUM (1) was produced at a certain factory (because one factory is more efficient than the other); (2) generated more or less waste; (3) required more or less colors, ink, or solvents; (4) was produced in smaller or larger quantities; (5) was produced off-line or on-line; and (6) required transparent or colored bags. TPBI also argued that much of the total production of the foreign like merchandise and the subject merchandise was produced at both of its factories, and thus there was no cost-shifting between the foreign and domestic markets.

Commerce agreed "there are many factors that may influence cost differences between products," J.A. 5546 n.3, but maintained its position that allocating costs based on physical characteristics is "most certainly" the primary factor in a cost analysis. J.A. 5546 n.3. Therefore, Commerce found the costs reported by TPBI could not be used because they did not "reasonably reflect the costs associated with the production and sale of the merchandise." *See* 19 U.S.C. § 1677b(f)(1)(A).

For instance, in CONNUM pair A, "the *only* difference in physical characteristics between the two models was the slight difference in the percentage of color concentrate contained in each product." J.A. 5544. Despite this small difference, the machine hours given for the two products were significantly different. Commerce properly found it was unreasonable that the difference in color concentra-

tion would create such divergent results in machine hours. Additionally, the fact that "most of the CONNUM pairs were made at the same facility," *Thai Plastic I*, 853 F. Supp. 2d at 1272, belied TPBI's contention that the factory in which the CONNUM was produced had an impact on the reported costs.

Thus, Commerce found TPBI's methodologies artificially shifted the conversion costs of the CONNUMs sold in the home market and in the United States. A methodology "that shifts costs unreasonably from U.S. sales to home-market sales can heavily influence the Department's entire antidumping calculation." J.A. 5545. "As a general rule, an agency may . . . reject the records if accepting them would distort the company's true costs." *Thai Pineapple Pub. Co. v. United States*, 187 F.3d 1362, 1366 (Fed. Cir. 1999).

Similarly, TPBI argues that "Commerce, inexplicably, ignored th[e] record evidence" that differing production quantities accounted for the discrepancies in price within the CONNUM pairs. Appellant's Br. 35. Commerce in fact acknowledged TPBI's argument that its conversion costs varied because of, inter alia, whether a CONNUM was produced in "larger or smaller quantities," J.A. 5544, but properly determined that production quantities were not physical characteristics that would drive costs.

Because TPBI departed from its normal accounting principles and failed to base its costs on physical characteristics, Commerce relied on substantial evidence in determining the reported conversion costs were distortive and did not reasonably reflect the actual costs. Commerce was therefore not required to rely upon those records.

### III. Commerce Reasonably Reallocated the Conversion Costs

After rejecting TPBI's reported costs as distortive, Commerce reallocated the costs by weight-averaging

conversion costs evenly across all CONNUMs. The Statement of Administrative Action provides that if Commerce determines that costs reported by a respondent are "shifted away from the production of the subject merchandise, or the foreign like product," Commerce has the authority to "adjust costs appropriately to ensure that [the costs] are not artificially reduced." Statement of Administrative Action at 4172; *see also* J.A. 5099, 5217. It was proper for Commerce to exercise its authority to make adjustments to the distortive costs TPBI reported. The CIT found that Commerce properly adjusted the reported costs in order to "ensure that they were not artificially reduced and distortive of true costs." *Thai Plastic I*, 853 F. Supp. 2d at 1273.

TPBI contends that "[e]ven if this Court finds some ambiguity in the statute, under step two of the *Chevron* analysis, Commerce's application of a physical characteristics test to determine reasonable production costs is an impermissible statutory interpretation." Appellant's Br. 21. Commerce supported its emphasis on physical differences in part by analogizing to the DIFMER analysis in 19 C.F.R. § 351.411(b). *See also* 19 U.S.C. § 1677b(a)(6)(C)(ii). Commerce typically uses the DIFMER principle in its analysis of what constitutes "a reasonable allowance" for differences in the physical characteristics between products sold in the United States and those sold in foreign markets. *See* 19 C.F.R. § 351.411. That regulation states, in part:

> In comparing United States sales with foreign market sales, the Secretary may determine that the merchandise sold in the United States does not have the same physical characteristics as the merchandise sold in the foreign market, and that the difference has an effect on prices. In calculating normal value, the Secretary will make a reasonable allowance for such differences.

*Id.* § 351.411(a). TPBI argues Commerce's use of DIFMER to differentiate products within the home market is inconsistent with this regulatory authority.

TPBI misconstrues Commerce's actions. Though Commerce focused on physical characteristics, it did not apply DIFMER as it appears in 19 C.F.R. § 351.411. As the CIT explained, "Commerce also has a practice of comparing cost allocations using physical characteristics of the product in its determination of whether a company's cost allocation strategy reasonably reflects actual costs." *Thai Plastic I*, 853 F. Supp. 2d at 1273. Commerce applied this latter practice in reallocating the conversion costs.

TPBI argues Commerce's reliance on physical characteristics is also inconsistent with subsection (b) of the DIFMER regulation, which states that Commerce, in determining the DIFMER adjustment, "will consider only differences in variable costs associated with the physical differences." 19 C.F.R. § 351.411(b). To TPBI, the regulation's statement that Commerce "will not consider differences in [COP] when compared merchandise has identical physical characteristics," *id.* § 351.411(b), anticipates the existence of COP differences unrelated to physical differences and prohibits considering or adjusting for them. This, TPBI contends, "contradicts Commerce's position that it may adjust for cost differences that it finds are unrelated to physical characteristics." Appellant's Br. 24.[6]

---

[6]   This argument is inconsistent with TPBI's earlier arguments, *supra* p. 14–15, that Commerce *should* have considered TPBI's machine hours allocation criteria which are unrelated to physical characteristics.

Commerce recognized the intended context of the DIFMER regulation, and acknowledged it "is an adjustment to price and not costs such that the provision does not apply directly, as a matter of law, to our analysis of costs." J.A. 5546 n.2. Commerce nonetheless explained that "the necessity of using physical characteristics in making comparisons is key to both" a DIFMER analysis under § 351.411(b) as well as the below-cost analysis. J.A. 5546 n.2. In the Final Results, Commerce stated that its focus on physical characteristics for costs was "supported by [19 U.S.C. § 1677b(a)(6)(c)(ii)]," and that "[s]uch comparison criteria are logical because physical characteristics provide [Commerce] with a dependable, measurable means of comparing two different products sold in two different markets." J.A. 5546.

By requiring that conversion costs reflect cost differences attributable to different physical characteristics, Commerce "ensure[d] that the product-specific costs . . . reflect[ed] the costs incurred by [TPBI] to obtain the corresponding product's physical characteristics." J.A. 5546. As explained above, physical differences in products "generally account" for major differences in costs. *See* Preamble to Proposed Rules, 61 Fed. Reg. at 7339 (discussing proposed 19 C.F.R. § 351.406). Reliance on physical characteristics, because of its ability to promote consistency, is a predictable methodology that is administrable across all investigations and administrative reviews.

Here, as the CIT explained, consideration of physical characteristics is "a primary factor in Commerce's analysis." *Thai Plastic I*, 853 F. Supp. 2d at 1273. When other factors influence cost allocation, it is customary for Commerce to "adjust a company's reported allocation methodology to reflect costs based solely on physical characteristics." J.A. 5098 The relevant statute states that Commerce must "consider all available evidence on the proper allocation of costs," but leaves to Commerce's

discretion both the meaning of "proper allocation" and what factors can drive the assignments of those allocations. *See* 19 U.S.C. § 1677b(f)(1)(A).

"[W]e accord substantial deference to Commerce's statutory interpretation, as [Commerce] is the master of the antidumping laws." *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (internal quotation marks and citation omitted). Commerce's methodology is "presumptively correct," and TPBI has not shown that Commerce lacked authority to adjust costs based on differences in physical characteristics. *See id.* TPBI does not offer any persuasive evidence for the proposition that Commerce cannot consider physical characteristics in both a cost analysis and a price analysis. As a practical matter, it would distort the overall antidumping analysis if the physical characteristics used for a price analysis did not reflect the same physical characteristics used in a COP analysis.

TPBI nonetheless asserts that Commerce's analysis in the Final Results is contradicted by the text of 19 C.F.R. § 351.407(c), which it contends obligated Commerce to perform a "comprehensive examination of quantitative and qualitative production factors before revising or dismissing a respondent's cost allocation." Appellant's Br. 26. That regulation, however, states only that Commerce "*may* take into account production quantities, relative sales values, and other quantitative and qualitative factors associated with the manufacture and sales of the subject merchandise and foreign like product" in determining the appropriate method for allocating costs among products. 19 C.F.R. § 351.407(c) (emphasis added). The language of the regulation makes clear that Commerce *may* take factors other than physical characteristics into account, but is not *required* to do so. TPBI points to no statutory or regulatory requirement that Commerce is obliged to "address all potential cost factors" in its below-cost analysis. *See Thai Plastic I*, 853 F. Supp. 2d at 1274.

TPBI also contends that Commerce's reallocation methodology is unsupported by substantial evidence, because Commerce "focused on a limited sampling, i.e., nine similar pairs of CONNUMs, out of over 100 CON-NUMs." Appellant's Br. 34. TPBI is correct that Commerce looked only to nine out of one hundred CONNUM pairs, however, TPBI does not offer any evidence or specific argument that this sampling biased or corrupted Commerce's analysis. This court has recognized that "Congress has implicitly delegated authority to Commerce to determine and apply a model-match methodology necessary to yield 'such or similar' merchandise under the statute," which "empowers Commerce to choose the manner in which 'such or similar' merchandise shall be selected." *Koyo Seiko Co. v. United States*, 66 F.3d 1204, 1209 (Fed. Cir. 1995) (discussing "such or similar merchandise" under 19 U.S.C. 1677(16) (1988), which is now termed "foreign like product," *id.* § 1677(16) (2006)). Accordingly, TPBI's argument is unpersuasive.

Finally, according to TPBI, Commerce incorrectly relied on three past administrative reviews[7] which involved reallocation of reported costs. Commerce referenced the three reviews in support of its decision to reject TPBI's reported cost-allocation methodologies as distortive "when such cost differences are attributable to factors beyond physical characteristics." J.A. 5547. Relevant to its

---

[7] Stainless Steel Bar from the United Kingdom, 72 Fed. Reg. 43,598 (Dep't of Commerce Aug. 6, 2007); Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Japan, 64 Fed. Reg. 24,329 (Dep't of Commerce May 6, 1999); Small Diameter Circular Seamless Carbon and Alloy Steel, Standard, Line and Pressure Pipe from Brazil, 60 Fed. Reg. 31,960 (Dep't of Commerce June 19, 1995).

analysis, Commerce cited the reviews as examples of cases in which Commerce made adjustments when the respondent's reported cost differences were *not* attributable to physical characteristics of the merchandise. As the CIT found, "[d]espite TPBI's argument that each of the cited cases is distinguishable, Commerce analyzed TPBI's costs in line with the agency practice of considering whether costs are allocated according to physical characteristics of the product as a primary factor." *Thai Plastic I*, 853 F. Supp. 2d at 1275.

## IV. Commerce Reasonably Applied DIFMER

When calculating normal value, Commerce utilizes a DIFMER standard in reviewing what constitutes a reasonable allowance for differences in the physical characteristics of products sold in the United States and in foreign markets. *See* 19 C.F.R. § 351.411. Here, after Commerce reallocated TPBI's overhead and labor costs, it also conducted a DIFMER analysis between subject merchandise in the home market and the export market, pursuant to 19 C.F.R. § 351.411. In this analysis, Commerce determined it would not factor the direct labor and variable costs into the calculated DIFMER adjustments. Instead, Commerce calculated DIFMER adjustments "based solely on differences in the costs of materials."[8] J.A. 5549. TPBI argues that Commerce not only improperly rejected its conversion costs, it "misapplied the DIFMER adjustment again when attempting to utilize it in the proper context," that is, after calculating COP.

---

[8] Title 19 U.S.C. § 1677b(e)(1) requires that CV be calculated in part, from "the cost of materials and fabrication or other processing of any kind employed in producing the merchandise, during a period which would ordinarily permit the production of merchandise in the ordinary course of business."

Appellant's Br. 30. DIFMER, TPBI contends, is meant to adjust for all variable costs, not merely the cost of materials. Thus, to TPBI,

> Commerce's weight-averaging of per-unit direct labor, variable overhead and fixed overhead costs across all products in calculating conversion costs, actually distorted its subsequent DIFMER adjustment to normal value, because Commerce's latter adjustment only accounted for differences in cost of materials, not labor and other variable costs.

*Id.* at 32. TPBI essentially argues that by reallocating the conversion costs evenly across all products, the DIFMER adjustment would be limited to differences in reported material among products, effectively distorting the DIFMER adjustment. Commerce forthrightly acknowledged that "[i]n fact, our reallocation does disregard the DIFMER adjustment with respect to conversion costs." J.A. 5549. Commerce determined that factoring in labor and variable costs in the DIFMER adjustments was outweighed by the need to adjust for "grossly disparate" distortions in TPBI's proposed allocation methodologies. J.A. 5549.

In a Policy Bulletin, Commerce explained that when reported "cost differences are high but the actual physical differences appear small," Commerce should determine whether the reported differences in cost indicate "conditions unrelated to the physical difference." Import Administration Policy Bulletin, No. 92.2 (Dep't of Commerce July 29, 1992). "If the costs of the physical difference cannot be isolated or it is not reasonably clear that the differences in production cost are related to the physical difference, no adjustment should be made." *Id.* As discussed above, TPBI's reported conversion costs were not based on physical characteristics, and it was reasonable to

limit the DIFMER adjustment to differences in material costs.

CONCLUSION

In light of the foregoing, the CIT correctly affirmed Commerce's rejection of TPBI's allocation methodologies and its reallocation of TPBI's conversion costs.

**AFFIRMED**